THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　Plaintiff,<br><br>PUYALLUP TRIBE OF INDIANS, *et al.*,<br><br>　　　　　　　Plaintiff-Intervenors,<br><br>　v.<br><br>ELECTRON HYDRO, LLC and THOM A. FISCHER,<br><br>　　　　　　　Defendants. | CASE NO. C20-1746-JCC<br><br>ORDER |

This matter comes before the Court on Plaintiff's motion for summary judgment (Dkt. No. 123), Plaintiff-Intervenor Puyallup Tribe of Indians' motion for partial summary judgment (Dkt. No. 130), and Defendants' motion for partial summary judgment (Dkt. No. 124). Having thoroughly considered the briefing and the relevant record, and finding oral argument unnecessary, the Court hereby GRANTS in part and DENIES in part the motions for the reasons explained herein.

I.   BACKGROUND

The Clean Water Act ("CWA") is intended "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). It prohibits,

amongst other things, the discharge of pollutants into "navigable waters" absent compliance with its permitting requirements. *See* 33 U.S.C. §§ 1251, 1311(a). And it provides for several enforcement measures. For example, the U.S. Environmental Protection Agency ("E.P.A.") may seek monetary penalties through a civil enforcement action. *See* 33 U.S.C. § 1319(b), (g). The E.P.A. may also seek to enjoin a continued discharge. *See* 33 U.S.C. § 1364. A private citizen may also bring a civil suit under the CWA "against any person . . . who is alleged to be in violation of [the CWA]." *See* 33 U.S.C. § 1365(a), (h).

In 2014, Defendant Electron Hydro, LLC ("Electron Hydro") acquired a power generating facility along the Puyallup River (this river, by stipulation, is navigable water subject to CWA protection). (*See* Dkt. Nos. 127-5 at 2, 125-17 at 2.) The facility was comprised of a variety of components; one of which, the power intake, included a wooden spillway, with an intake on one side and a fish ladder on the other side. (*See* Dkt. No. 126-3 at 8.) Electron Hydro planned various improvements to this area, including replacing the spillway with an inflatable bladder-type spillway. (*See* Dkt. No. 127-7.) In the summer of 2020, it moved forward on this work. (*Id.*)

As a preliminary step, it needed to divert water away from the spillway to demolish and replace it. (*Id.*) After constructing a temporary diversion channel, Electron Hydro and its contractor hit a snag. Shortly after it directed water into the channel, a portion of the high-density polyethylene ("HDPE") lining material ruptured. (*See* Dkt. No. 127-12.) This sent pieces of the HDPE downstream, along with underlying geotextile fabric and field turf, which Electron Hydro's contractor used to cushion the HDPE. (*Id.*) This also released loose particles of crumb rubber. (*Id.*) Those particles had been contained within the turf, but when it ruptured, the crumb rubber released and went downstream as well. (*Id.*)

Pierce County[1] and the U.S. Army Corps of Engineers ("Corps"),[2] upon learning of this development, issued stop-work orders. (Dkt. Nos. 127-14, 127-15.) At that point, the agencies' primary focus became (1) preserving adequate flow to the fish ladder, (2) removing the downstream foreign material, and (3) ensuring no additional material went downstream. (*See* Dkt. Nos. 125-5 at 9–10, 130-3 at 22.) A complicating factor was the short work window available—to minimize the impact of in-stream construction to endangered salmon, this period was typically limited to a couple months during the late summer. (*See* Dkt. No. 127-47 (work period extension request).) Therefore, not much time was left.

Electron Hydro knew that it needed to direct water away from the channel to remove the remaining lining material. But the parties disagreed over the best approach, particularly in light of the short time window. (*See generally* Dkt. Nos. 123, 124, 130, 137.) Because the original spillway was now gone, Electron Hydro felt it appropriate to continue with its original plan, *i.e.*, install the bladder-style spillway right away. (Dkt. No. 127-12 at 8.) Only then would it divert water away from the channel and recover whatever foreign material remained. (*Id.*) The Puyallup Tribe of Indians, Pierce County and the Corps disagreed. They wanted Electron Hydro to remove the material as quickly as possible—before any other work on the spillway. (*See* Dkt. Nos. 127-25, 127-31, 127-33, 127-38, 127-41, 127-42, 127-43).

After significant back-and-forth, and faced with a now-dwindling construction season, Electron Hydro proposed a scaled-back plan, limited to construction of an interim rock structure

---

[1] Pierce County had issued a shoreline substantial development permit for the project. (*See* Dkt. No. 127-9.) None of the CWA claims in this suit directly implicate compliance with that permit. Therefore, the Court will not address this issue.

[2] The Corps previously indicated that the project, at least as described to it, was covered under Nationwide Permits ("NWP") 3 and 13 for permissible dredging or fill activities, *i.e.*, CWA Section 404-exempt activities. (*See* Dkt. No. 127-10.) As such, it concluded, no individual permit would be needed for the initially proposed work. (*Id.*) But Electron Hydro did not advise the Corps of the type of material it would line the diversion channel with. (*See* Dkt. No. 125-5 at 9–10; *see also* Dkt. No. 127-7 at 27, 29 (generic reference in plans to liner material).) Meaning, the Corps had not considered Electron's use of field turf in assessing the project's compliance with the NWPs.

where the original spillway once stood, in order to stabilize the inlet area. (*See* Dkt. No. 127-35.) This did not involve installation of the inflatable bladder spillway (at least not during the remaining 2020 construction season). (*Id.*) Based on this proposal, the Corps and Pierce County lifted the stop work orders. (*See* Dkt. Nos. 127-2, 127-3.) Electron Hydro modified the plan one last time—it added a steel sheet on the upstream side of the temporary rock structure to reduce entrapment hazards to passing fish.[3] (*See* Dkt. No. 127-50.) Finally, in late October 2020, with the details nailed down, Electron Hydro constructed the temporary rock spillway, shifted flow away from the diversion channel, and removed the remaining foreign material from the diversion channel. (*See* Dkt. No. 127-1 at 6.) It has engaged in no significant work since, as it awaits permitting under the Endangered Species Act and other regimes. (*Id.* at 6–7.)

The United States, on behalf of the E.P.A., was the first to file suit, which it did in the fall of 2020. (*See* Dkt. No. 1.)[4] It sought civil penalties and injunctive relief for a variety of alleged CWA violations. The Court later granted the Puyallup Tribe of Indians' motion to intervene. (Dkt. No. 37.) The Tribe sought similar, but not the same, relief as Plaintiff. (*Compare* Dkt. No. 73 at 22–23, *with* Dkt. No. 82 at 35–37.) Citizens for a Healthy Bay, and Puget Soundkeeper Alliance also sought to intervene—a request the Court later granted. (*See* Dkt. No. 28.)

Now before the Court are various summary judgment motions. Plaintiff seeks summary judgment on all claims, arguing there are no genuine issues of fact. (*See generally* Dkt. No. 123.) Communities for a Health Bay and Puget Soundkeeper Alliance join. (*See* Dkt. No. 131.) The Tribe moves for partial summary judgment on some of its claims. (*See generally* Dkt. No. 130.) And Defendants seek partial summary judgment solely on claims arising from construction of the temporary rock spillway. (*See generally* Dkt. No. 124.)

---

[3] According to Electron Hydro, the Washington Department of Fish and Wildlife put forth this requirement pursuant to its Hydraulic Project Approval ("HPA") authority. (*See* Dkt. Nos. 127-4, 127-51.) None of the claims in this matter involve HPA compliance, though, so no further discussion of this scheme will follow.

[4] It later amended the complaint. (*See* Dkt. No. 73.)

ORDER
C20-1746-JCC
PAGE - 4

## II. DISCUSSION

### A. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making such a determination, the Court must view the facts and justifiable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party "must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original) (quoting Fed. R. Civ. P. 56(e)). The nonmoving party "may not rest upon the mere allegations or denials of his pleading . . . ." *Anderson*, 477 U.S. at 248 (citations omitted).

### B. Use of Field Turf

In general, to discharge a pollutant into the Puyallup River, Electron Hydro needed a Section 402 National Pollution Discharge Elimination System ("NPDES") permit. *See* 33 U.S.C. §§ 1311(a), 1342(b). Similarly, to place fill material into the river, it needed either a site-specific Section 404 permit or to demonstrate compliance with an applicable Nationwide Permit ("NWP"). *See* 33 U.S.C. §§ 1311(a), 1344(a), (e). Because Plaintiff and the Tribe allege Electron Hydro lacked authority under either CWA permitting regime, they assert three distinct causes of action regarding use of the lining materials, each of which they now seek summary judgment on: (1) a 33 U.S.C. § 1311(a) violation based on Electron's initial placement of lining materials in the diversion channel, (2) a separate and distinct § 1311(a) violation for its breakup and downstream transport, and (3) a § 1344 violation based on Electron's failure to comply with NWPs 3 and 13. (*See* Dkt. Nos. 73 at 17–20, 82 at 26–30.) Before turning to the merits, the Court first addresses Defendants' threshold arguments regarding the Tribe's claims.

First, Defendants contend that any of the Tribe's claims as to Electron Hydro's use of HDPE and the geotextile fabric are inadequately pled and, therefore, untimely. (*See* Dkt. No. 139

at 7.) The Court agrees, at least with respect to the geotextile fabric. As it relates to the HDPE, the Tribe referenced it frequently throughout the complaint, (*see, e.g.*, Dkt. No. 82 at 14–16 (interchangeably using "HDPE" or "plastic liner")), all of which, the Tribe then incorporated into its claims, (*see id.* at 26–30.) But the same cannot be said for the geotextile. There is no mention of it in the Tribe's complaint. (*See generally* Dkt. No. 82.) While the Tribe suggests it should be granted leave to amend, to now include such allegations, this would be unduly prejudicial. *See Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004) (establishing factors to consider the propriety of a Rule 15(b) request to amend a pleading). Discovery is closed and the case is scheduled for trial in the next few months. (*See* Dkt. No. 119.) Defendants do not have sufficient time to prepare a defense for claims based on what would be newly introduced geotextile allegations. For this reason, the Tribe is barred from seeking relief based on Electron Hydro's use of geotextile fabric in the diversion channel.

      Second, Defendants contend that, because it is undisputed that Electron Hydro removed the remaining turf and HDPE from the diversion channel, the Tribe may not now seek relief based on the discharge of these materials into the river, at least pursuant to the CWA's citizen suit provision, 33 U.S.C. § 1365. (*See* Dkt. No. 139 at 5.) This is because, according to Defendants, the Tribe could not make a good-faith allegation of ongoing harm from the turf and HDPE, which is a baseline requirement for a citizen suit. (*See* Dkt. No. 139 at 5 (citing *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 64 (1987)).) But the Tribe provides unrefuted evidence that pieces of these materials persist, both proximate to and downstream of where the diversion channel stood. (*See* Dkt. No. 135-1 at 8–11.) So the clean-up is not complete. Accordingly, the Court FINDS that it does have jurisdiction over the Tribe's CWA claims, at least based on Electron Hydro's use of HDPE and field turf.

      The Court now turns to the merits of Plaintiff and the Tribe's first three claims.

1. <u>Initial Placement of Turf</u>[5]—§ 1311(a) Violation

In their first respective causes of action, Plaintiff and the Tribe contend that the addition of the field turf to the diversion channel represented a 33 U.S.C. § 1311(a) violation. (Dkt. Nos. 73 at 17–18, 82 at 26–27.) A claim based on a § 1311(a) violation requires one to prove the following: A <u>discharge</u> of a <u>pollutant</u> into <u>navigable waters</u> from a <u>point source</u> <u>without permit authorization</u>. *Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 532 (9th Cir. 2001). Here, there is no dispute that, when Electron Hydro's contractor initially placed the field turf into the diversion channel, it was an <u>unpermitted</u> <u>discharge</u> of that material into <u>navigable water</u>. (*See* Dkt. Nos. 125-5 at 9, 125-17 at 2, 137 at 7–9.) The only issues, then, are (a) whether the turf constitutes a <u>pollutant</u> and (b) whether it was discharged from a <u>point source</u>. For the reasons described below, the Court FINDS that, based on the undisputed facts, the placement of the turf into the diversion channel does, indeed, qualify as a <u>pollutant</u> discharged into the Puyallup River from a <u>point source</u>.

a. *The Field Turf Is a Pollutant*

A <u>pollutant</u>, according to the CWA, includes "solid waste . . . garbage . . . and industrial, municipal, and agricultural waste." 33 U.S.C. § 1362(6). While the CWA does not define waste, it is uncontroverted the field turf was "basically old" and "obviously used," and that Defendants acquired it "from a waste yard" where "somebody had accumulated and stored rolls of used turf." (Dkt. No. 130-3 at 267; *see also id.* at 103 (describing the field turf as "trash").) According to a comparable environmental regime, CERCLA, once a product has "served its intended purpose and is no longer wanted" it is "waste." *See Ecological Rights Found. v. P. Gas and Elec. Co.*, 713 F.3d 502, 515 (9th Cir. 2013). Defendants present no persuasive argument why the same should not be said here. (*See* Dkt. No. 137 at 8–9.) Accordingly, the Court FINDS that the field turf is a <u>pollutant</u>.

---

[5] The briefing is devoid of argument regarding whether the use of the HDPE and geotextile materials was a separate CWA violation. (*See generally* Dkt. Nos. 123, 130, 137, 139.) Therefore, the Court reserves judgment on this issue.

### b. *It Was Discharged Via a Point Source*

A point source is "any discernable . . . conveyance . . . conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). This includes heavy equipment such as a "bulldozer" or "tractor." *Borden Ranch Partn. v. U.S. Army Corps of Engineers*, 261 F.3d 810, 815 (9th Cir. 2001). Here, it is undisputed that Electron Hydro and/or its contractor placed rolls of the field turf into the riverbed using a crane. (*See* Dkt. No. 127-1 at 10.) Defendants suggest that, because the rolls were then spread using "human hands," they were not discharged *by a point source*. (Dkt. No. 137 at 9.) But this does not address the initial conveyance. Moreover, Defendants do not present authority for the proposition that human hands could not be a means of conveyance. *See, e.g.*, *Rattlesnake Coalition v. U.S. E.P.A.*, 509 F.3d 1095, 1100 (9th Cir. 2007) (legal citation is required to support an argument opposing summary judgment). The Court FINDS that the field turf was, indeed, discharged into the Puyallup River through a point source.

Accordingly, the Court GRANTS summary judgment to Plaintiff and the Tribe on their first respective causes of action, at least as it relates to the field turf. (*See* Dkt. Nos. 73 at 17–18, 82 at 26–27.)

#### 2. Subsequent Breakup—Separate § 1311(a) Violation

In their second respective causes of action, Plaintiff and the Tribe contend that the introduction of water into the diversion channel and/or the resulting field turf breakup, which sent it and its constituent crumb rubber downstream, represents a separate 33 U.S.C. § 1311(a) violation. (Dkt. Nos. 73 at 17–18, 82 at 26–27.) The elements for this claim are the same as the first. The fundamental issue, which is a purely legal one, is whether this can represent a separate § 1311(a) violation, given the earlier violation of conveying the rolled turf into riverbed. For the reasons described below, the Court FINDS that it can and does.

Resolution of this issue turns on an interpretation of *L.A. Cnty. Flood Control Dist. v. Nat. Res. Def. Council, Inc.*, 568 U.S. 78 (2013). In that case, the Court found that the flow of polluted water from an improved portion of a navigable waterway to an unimproved portion was not a discharge. *Id.* at 81. In doing so, the Court relied heavily on a prior decision, *S. Fla. Water*

*Mgt. Dist. v. Miccosukee Tribe of Indians*, where it found that pumping polluted water from one part of a body of water to another was not a discharge. *See* 541 U.S. 95, 109–12 (2004). But there is an obvious distinction between those cases and this one. In those instances, the same storm sewer and/or runoff was conveyed between two points within the same waterway. *See L.A. Cnty. Flood Control Dist.*, 568 U.S. at 81–82; *S. Fla. Water Mgt. Dist.*, 541 U.S. at 100–02. The characteristics of the substance did not change. *Id.* Whereas here, the characteristics changed dramatically. It is undisputed that, what started as intact large sections of field turf conveyed into a confined area, became small pieces of turf and free-floating constituent crumb rubber disbursed downstream. (Dkt. No. 78 at 10–11.) This is much more analogous to *Rybachek v. U.S. E.P.A.*, 904 F.2d 1276 (9th Cir. 1990)[6] than to *L.A. Cnty. Flood Control Dist.* or to *S. Fla. Water Mgt. Dist.*

Accordingly, the Court GRANTS summary judgment to Plaintiff and the Tribe on their second respective causes of action. (*See* Dkt. Nos. 73 at 18–19, 82 at 27–29.)

### 3.   Turf Not Compliant with NWPs—§ 1344 Violation

In their third respective causes of action, Plaintiff and the Tribe contend that Electron Hydro used the field turf in a manner not conforming to its Section 404 permit and, as such, its use constituted a 33 U.S.C. § 1344 violation. (Dkt. Nos. 73 at 19–20, 82 at 29–30.) It is uncontroverted that the Corps did not have a site-specific Section 404 permit and, instead, relied on NWPs 3 (Maintenance) and 13 (Bank Stabilization). (*See* Dkt. No. 126-3 at 2.) Therefore, to succeed on their third respective claims, Plaintiff and the Tribe need only prove that some aspect of the field turf did not comply with those NWPs. *See* 33 U.S.C. § 1344(a); *see also* 40 C.F.R. § 122.41(a) (permit noncompliance constitutes a CWA violation). And Plaintiff points to two areas of noncompliance: (1) the turf "violated the condition that no material shall be 'placed in a

---

[6] In *Rybachek*, the court found that placer mining, which resuspended streambed material into stream flow, sufficiently changed the nature of that material as to constitute a new discharge. *See* 904 F.2d at 1285.

manner that will be eroded by normal or expected high flows'" and (2) it "violated the condition that prohibits permittees from using 'unsuitable material,' including 'trash' and 'debris.'" (Dkt. No. 123 at 19–20 (citing Issuance and Reissuance of Nationwide Permits, 82 Fed. Reg. 1860-01 (Jan. 6, 2017)).) The Tribe relies solely on the second issue—the turf material's suitability. (Dkt. No. 130 at 22.)

Defendants suggest that, because Electron Hydro did not initially expose the turf to the stream flow (instead using it solely as an underlayment to the HDPE liner), it did not *intend* for the turf to be exposed to water. (*See* Dkt. No. 137 at 10–11 (discussing its use purely as an underlayment).) Nevertheless, it undisputed that this is exactly what happened. (*See* Dkt. No. 78 at 10 (Defendant's admission that the HDPE liner breached, tearing the field turf and sending portions of it and constituent crumb rubber downstream).) Nothing in the NWPs speak to the issue of intent—just the "manner" in which the material is placed. *See* 82 Fed. Reg. 1860-01. And that manner is uncontroverted. (*See* Dkt. No. 78 at 10.) Nor is the result controverted—it broke up, *i.e.*, eroded. (*Id.*) This, alone, is sufficient to support summary judgment. If it were not, the Court also FINDS that the turf was unsuitable as a matter of law, because, as discussed above, *see supra* Part II.B.1.a., it was waste material, *i.e.*, trash.

Accordingly, the Court GRANTS summary judgment to Plaintiff and the Tribe on their third (respective) causes of action, at least as it relates to the field turf.[7] (*See* Dkt. Nos. 73 at 19–20, 82 at 29–31.)

**C.    Temporary Stabilization Activities**

All agree that Electron Hydro secured NWP 3 authorization well before the 2020 construction season began. (*See* Dkt. No. 127-10.) But Plaintiff and the Tribe contend this did not extend to the later-developed site stabilization plan. (*See* Dkt. Nos. 135 at 10–13, 136 at 18–20.)

---

[7] *See supra* note 5.

After the Corps issued its stop work order, (*see* Dkt. No. 127-15), Electron Hydro told it that Electron should be allowed to, nevertheless, continue with the spillway replacement as originally envisioned. (*See* Dkt. No. 127 at 2–4 (list of relevant communications).) When the Corps concluded inadequate time in the season remained, Electron formulated a plan to stabilize the area, which would allow it to return and complete the spillway replacement in a subsequent work season. (*See* Dkt. No. 127-31 (communication from Corps "requesting that [Electron] propose a plan to stabilize the work site, minimize impacts to aquatic resources and species and prepare for the high fall/winter water flows until the next in-water work opens").) The Corps agreed to this plan and lifted the stop work order, at least for the limited purpose of implementing it. (*See* Dkt. Nos. 127-2, 127-38, 127-44.)

Because this plan was not explicitly permitted, Plaintiff and the Tribe assert respective 33 U.S.C. § 1311(a) causes of action, (*see* Dkt. Nos. 73 at 21–22 (Plaintiff's fifth claim), 82 at 32–33 (Tribe's sixth claim)), and the Tribe asserts a § 1344 cause of action, (*see* Dkt. No. 82 at 29–30 (Tribe's third claim)). In addition, the Tribe asserts a cause of action pursuant to 33 U.S.C. § 1341 for Electron Hydro's failure to obtain a site-specific Section 401 certification. (*See id.* at 31–32 (Tribe's fifth claim).) Plaintiff, the Tribe, and Defendants each move for summary judgment on the § 1311(a) and § 1344 claims; the Tribe also moves for summary judgment on its § 1341 claim. (*See* Dkt. Nos. 123 at 22–23, 130 at 22–28, 124 at 16–22.)

       1.  <u>§ 1311(a) and § 1344 Claims</u>

Absent a site-specific Section 404 permit, Electron Hydro needed to comply with applicable NWPs when implementing its October 2020 temporary stabilization plan. *See* 33 U.S.C. § 1344(a), (e). And it is uncontested that it had no site-specific Section 404 permit. (*See generally* Dkt. No. 124.) Instead, Defendants contend that (1) its temporary stabilization efforts were authorized under the original NWP 3 authorization, based on the nature of the activity; if not, (2) Electron's discussions with the Corps throughout September 2020 were informal consultations which modified the Corp's prior NWP 3 authorization. (*See* Dkt. No. 124 at 16–

22.) Because the relevant facts are undisputed, resolution of these arguments turn on purely legal issues.

Defendant's first argument is without merit. In August 2018, the Corps verified that the spillway replacement project was authorized on the condition that it complied with NWP 3. (Dkt. No. 127-10.) But, as clearly indicated in the Corps' verification letter, this was based on the "proposal as depicted [by Electron] on the enclosed drawings dated March 28, 2017." (*Id.* at 2.) Defendants readily admit that the October 2020 stabilization activities were not included in those drawings. (*See* Dkt. No. 144 at 8.) Instead, Defendants point to a provision within NWP 3. (*See* Dkt. No. 124 at 16–22.) It authorizes the construction of a "temporary structure . . . '*necessary* to conduct the [exempt] activity.'" (Dkt. No. 144 at 8 (citing 82 Fed. Reg. at 1984) (emphasis added).) Defendants focus on the "necessary" language. (*Id.*) But they provide the Court with no authority suggesting that this provision circumvents the pre-activity verification process. Nor would it seem logical that it would. *See* 33 C.F.R. § 330.6(a) (describing verification process). Therefore, the Court FINDS that the October 2020 stabilization work was not authorized by NWP 3, at least as originally verified by the Corps in 2018. For this reason, Defendants' first argument fails.

Defendants' second argument is more compelling. They contend that the Corps utilized its discretion pursuant to 33 C.F.R. § 330.5(d)(2)(i) to modify the NWP 3 authorization, at least for the purpose of constructing the temporary spillway. (*See* Dkt. No. 124 at 21.) In response, Plaintiff and the Tribe focus on the caveat within each of the Corps' letters that they are "not a permit." (*See* Dkt. Nos. 135 at 10, 136 at 23–24 (referencing Dkt. Nos. 127-2, 127-38, 127-44).) That is not the point. Defendants do not argue that the letters are, in fact, site-specific or individual Section 404 permits. (*See generally* Dkt. Nos. 124, 144.) Rather, they argue that the letters modified the prior NSP 3 authorization, at least for purposes of implementing the proposed stabilization plan. (*Id.*) This is consistent with language within the letters. (*See, e.g.*, Dkt. No. 127-2 at 4 ("we are lifting the Stop Work Order for the implementation of the temporary activities as described [in Electron's proposal]" which represent "authorized

temporary work.").) To the extent this is not what the Corps intended, neither Plaintiff nor the Tribe provide a plausible explanation of what it did intend by those letters.[8]

Nor is the Court persuaded by the argument that Electron Hydro's application of field turf to the diversion channel permanently invalidated its NWP 3 authorization. (*See* Dkt. No. 136 at 20.) If that were so, there would be no need for regulations regarding suspending and/or modifying such authorizations—but there is. *See* 33 C.F.R. § 330.4(e). Nor would the Corps have had a basis to later *lift* the stop work order (*i.e.*, once invalid always invalid)—but it did three times. (*See* Dkt. Nos. 127-2, 127-38, 127-44). In addition, the Tribe's argument that, in fact, the original project did not qualify under NWP 3 authority in the first place, (*see* Dkt. No. 135 at 10), is unpersuasive, given the contents of the Corps' 2018 verification letter saying that it did. (Dkt. No. 127-10.) Use of the turf was, undoubtedly, not authorized pursuant to NWP 3. But nothing suggests that this alone is sufficient to permanently invalidate NWP coverage. *See* 33 C.F.R. § 330.1(c).

Accordingly, the Court GRANTS summary judgment to Electron Hydro and DENIES summary judgment to Plaintiff and the Tribe on Plaintiff's fifth and the Tribe's third and sixth causes of action, at least as it relates to construction of the temporary rock spillway.[9] (*See* Dkt. Nos. 73 at 21–22; 82 at 29–30, 32–33.)

        2.   § 1341 Claim

CWA Section 401 mandates that an applicant for a federal permit provide notice of certain permitted discharges, so that the regulating agency can determine whether the anticipated

---

[8] To the extent the Corps changed its mind as to what activity should be authorized, (*see* Dkt. No. 135-2), as it now appears to have done, (*see* Dkt. No. 136 at 23–24), it is too late. What is relevant is what it authorized in 2020, when the activity took place. Not a *post hoc* determination.

[9] Defendants moved for partial summary judgment solely on claims relating to construction of the temporary rock spillway—not on other October 2020 activities. (*See* Dkt. No. 124-1.) As a result, the Court will not consider the import of this ruling on other aspects of the the Tribe's § 1311(a) and/or § 1344 claims associated with stabilization activities. (*See* Dkt. No. 82 at 30, 33.)

discharge may exceed effluent limitations. *See* 33 U.S.C. § 1341(a). The Tribe asserts a cause of action based on Electron Hydro's failure to obtain a project-specific certification from the Washington Department of Ecology for its October 2020 stabilization work. (*See* Dkt. No. 82 at 31–32.) And it now seeks summary judgment on this claim. (*See* Dkt. No. 130 at 25–28.) For the reasons described below, the Court declines to do so.

Electron Hydro submitted a Joint Aquatic Resources Permit Application as part of the original spillway replacement project. (*See* Dkt. No. 130-3.) And it provided the Department of Ecology with Section 401 notice, which the Department declined to act on. (*Id.* at 17.) Because, as discussed above, that same NWP 3 authorization remains in effect, albeit in a limited form, it is not entirely clear whether an additional 401 notification would be required, at least as suggested by the flush language of the CWA. *See* 33 U.S.C. § 1341(a) (referencing an "applicant"). While the Tribe suggests as much, (*see* Dkt. No. 147 at 13–14), it provides no legal citation supporting this interpretation of the CWA. And a naked argument lacking in legal citation is insufficient to support summary judgment. *See, e.g.*, *Rattlesnake Coalition*, 509 F.3d at 1100.

Accordingly, the Court DENIES summary judgment to the Tribe on its fifth cause of action.[10] (*See* Dkt. No. 82 at 31–32.)

D.   **Construction Stormwater General Permit Compliance**

The CWA also allows for construction-related storm water discharges through Section 402 Construction Stormwater General Permits ("CSWGP"). *See* 33 U.S.C. § 1342(b). Both Ecology and/or the E.P.A. are charged with enforcing compliance with these permits. *Id.* In 2018, Ecology issued Electron Hydro a CSWGP. (*See* Dkt. No. 128-2.) Plaintiff later asserted a

---

[10] While Defendants indicate they seek partial summary judgment on "all claims relating to the temporary rock spillway," (*see* Dkt. No. 124 at 4 (cleaned up)), they provide no argument supporting summary judgment on the Tribe's fifth cause of action, which implicates compliance with 33 U.S.C. § 1341.

cause of action for noncompliance with aspects of this permit, which it now seeks summary judgment on. (*See* Dkt. Nos. 73 at 20–21, 123 at 24–29.)

Plaintiff first seeks summary judgment on Electron Hydro's failure to update its Notice of Intent ("NOI") to reflect the true size of the construction area, *i.e.*, the disturbed area. (Dkt. No. 123 at 24.) Electron Hydro originally reported this to be 4.5 acres. (*See* Dkt. No. 128-6 at 3.) Anything above five acres triggers additional monitoring requirements. (*See, e.g.*, Dkt. No. 128-4 at 17.) But by June 2020, Steven Goodrich, the Electron Hydro employee responsible for stormwater inspections, determined that this amount was "low" and, in fact, it was "closer to six or seven" acres. (Dkt. Nos. 125-3 at 31, 138-8 at 20.) Nevertheless, Electron Hydro did not contemporaneously revise its NOI. (*See* Dkt. No. 137 at 18–19.) Defendants only response is to take issue with the total amount of disturbed area, as later determined by Ecology (which it estimated to be closer to ten acres). (*Id.*) But this does not establish a genuine issue of fact as to whether Electron Hydro underreported the disturbed area based on information available to it, *and* that this underreporting reduced otherwise-applicable monitoring requirements. Therefore, the Court FINDS this is a 33 U.S.C. § 1342 violation.

Plaintiff next seeks summary judgment on Electron Hydro's failure to (a) adequately stabilize soil in the construction area, provide secondary containment of equipment containing fuel, and maintain and repair erosion and sediment control Best Management Practices, all of which were required. (*See* Dkt. Nos. 123 at 25–26, 128-4 at 29–34.)[11] Ecology confirmed this to be true through post-incident inspections. (*See* Dkt. Nos. 128-6 at 3, 15, 16; 128-7 at 3, 9–11; 128-8 at 14, 18; *see also* Dkt. No. 129 at 2–3 (declaration of E.P.A. biologist and enforcement officer).) Defendants ostensibly concede this issue. (*See* Dkt. No. 137 at 17 (noting inspectors "saw what they saw").) Therefore, the Court FINDS this is also a 33 U.S.C. § 1342 violation.

Plaintiff also seeks summary judgment on Electron Hydro's inspection and recordkeeping practices. (*See* Dkt. No. 123 at 27–28.) Pursuant to its CSWGP, it needed to perform and log

---

[11] By failing to follow these practices, Ecology asserted that Electron Hydro increased turbidity risk during construction activities. (*Id.*)

weekly inspections in a manner prescribed by its permit. (*See* Dkt. No. 128-4 at 14–16.) Plaintiff points to the period from July 2018 through August 8, 2020. (Dkt. No. 123 at 27–28.) During this time, Electron Hydro prepared no contemporaneous logs; instead, Mr. Goodrich recreated inspection reports after the fact, using field book notes. (*See* Dkt. No. 125-10 at 2–201.) But, as Plaintiff rightly points out, this does not meet CSWGP requirements. (*See* Dkt. No. 128-4 at 15.) Therefore, the Court FINDS this is also a 33 U.S.C. § 1342 violation.

Finally, Plaintiff seeks summary judgment on Electron Hydro's failure, on six occasions, to timely submit water sampling results through discharge monitoring reports. (*See* Dkt. No. 123 at 9.) This is another CSWGP requirement and, therefore, a potential violation. (*See* Dkt. No. 128-4 at 21–22.) Defendants assert this allegation is not adequately pleaded. (*See* Dkt. No. 137 at 22–23.) The Court disagrees. The complaint's reference to CSWGP Condition S5.B is sufficient, as this is the condition at issue here. (*See* Dkt. No. 73 at 11–12.) Therefore, the Court FINDS this is also a 33 U.S.C. § 1342 violation.

Accordingly, the Court GRANTS summary judgment to Plaintiff on its fourth cause of action. (*See* Dkt. No. 73 at 20–21.)

### E. Persons Subject to CWA Liability

Lastly, Plaintiff and the Tribe ask the Court to find both Defendants—Electron Hydro *and* its Governor, COO, and Manager Thom Fischer—liable for the violations described above. (*See* Dkt. Nos. 123 at 13–15, 130 at 28–30.) Mr. Fischer's leadership role is not disputed.[12] (Dkt. Nos. 73 at 3, 81 at 3.) But this is not dispositive. For liability to attach, Plaintiff and/or the Tribe must demonstrate that Mr. Fischer was personally involved in the violations, *see* U.S.C. § 1319(a)(1), or that he is responsible for them based on the responsible officer doctrine. *U.S. v. Iverson*, 162 F.3d 1015, 1025 (9th Cir. 1998). The Court concludes that Mr. Fischer is liable based on either mechanism.

As to direct involvement, Plaintiff and the Tribe point to testimony and evidence

---

[12] He also admits that he is a "person" as defined by the CWA. (Dkt. No. 125-5 at 8.)

describing his knowledge of, and control over, the day-to-day aspects of the 2020 construction work, and his role in the permitting process. (*See* Dkt. Nos. 123 at 13, 130 at 28–30, 141 at 17–18 (citing Dkt. Nos. 78 at 12, 125-3 at 5–6, 10–11, 28–29; 125-11 at 5; 125-12 at 5, 11, 14–15, 22; 125-16 at 5; 130-3 at 5, 116, 123, 126, 220, 223–25, 233–34; 142-3 at 5).) Defendants present evidence that the decision to use the turf was initially that of a contractor, and that Mr. Fischer was not on-site when its installation began. (*See* Dkt. No. 138-4 at 3–4, 7–9.) But this is of no import, as Plaintiffs and the Tribe present unrefuted evidence that Mr. Fischer arrived later that day and, ostensibly, ratified this and many other decisions resulting in CWA violations. (*See, e.g.*, Dkt. Nos. 125-12 at 5, 11, 14–15, 22; 130-3 at 5, 116, 123, 126, 220, 223–25, 233–34.) Therefore, Defendants fail to establish a genuine issue of fact regarding Mr. Fischer's personal involvement in the conduct resulting in the violations described above.

Mr. Fischer also had "authority to exercise control over [Electron Hydro's] activity that is causing the discharges." *Iverson*, 162 F.3d at 1025 (9th Cir. 1998). This appears undisputed. (*See generally* Dkt. Nos. 137 at 24–27.) This is sufficient to trigger the responsible officer doctrine. Defendants suggest that Mr. Fischer can escape liability because he delegated some of the initial decisions resulting in the violations. (*See* Dkt. No. 137 at 24–26.) But this is not a shield from liability under the doctrine. *See, e.g.*, *Duarte Nursery, Inc. v. U.S. Army Corps of Engineers*, 2016 WL 4717986, slip op. at 14 (E.D. Cal. 2016); *see also Stillwater of Crown Point Homeowner's Ass'n, Inc. v. Kovich*, 820 F. Supp. 2d 859, 889 (N.D. Ind. 2011) (compiling cases applying the doctrine to CWA civil enforcement actions). This is particularly true here, where Plaintiff and the Tribe point to repeated instances where Mr. Fischer then ratified those decisions. (*See, e.g.*, Dkt. Nos. 125-12 at 5, 11, 14–15, 22; 130-3 at 5, 116, 123, 126, 220, 223–25, 233–34.)

Accordingly, the Court FINDS that Electron Hydro and Mr. Fischer are both liable for the CWA violations described above.

### III.   CONCLUSION

For the reasons described above, Plaintiff's motion for summary judgment (Dkt. No. 123)

is GRANTED in part and DENIED in part, Plaintiff-Intervenor Puyallup Tribe of Indians' motion for partial summary judgment (Dkt. No. 130) is GRANTED in part and DENIED in part, and Defendants' motion for partial summary judgment (Dkt. No. 124) is GRANTED in part and DENIED in part.

A bench trial in this matter is currently set for October 10, 2023. Accordingly, the parties are ORDERED to meet and confer and provide the Court with a joint status report no later than September 15, 2023. It should summarize what genuine issues of fact remain that the parties believe are necessary to resolve the claims not fully disposed of by the rulings above.

DATED this 31st day of August 2023.

John C. Coughenour
UNITED STATES DISTRICT JUDGE