THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> PUYALLUP TRIBE OF INDIANS, *et al.*, <br><br> Plaintiff-Intervenors, <br><br> v. <br><br> ELECTRON HYDRO, LLC and THOM A. FISCHER, <br><br> Defendants. | CASE NO. C20-1746-JCC <br><br> ORDER |

This matter comes before the Court on Plaintiff's motion (Dkt. No. 161) for entry of a consent decree (Dkt. No. 161-1) resolving its claims in this Clean Water Act ("CWA") civil enforcement action. Plaintiff-Intervenor the Puyallup Tribe of Indians lodges objections to the proposed decree (Dkt. No. 162), as do Plaintiffs-Intervenors Communities for a Healthy Bay and Puget Soundkeeper Alliance ("Conservation Groups") (Dkt. No. 166). Having duly considered the proposed decree, the objections at issue, and the relevant record, the Court DENIES the objections (Dkt. Nos. 162, 166) and GRANTS the motion (Dkt. No. 161) for the reasons described below. The Court will enter the consent decree (Dkt. No. 161-1) as proposed.

## I. BACKGROUND

The Court described the salient facts of this case in a prior order. (*See* Dkt. No. 149.) It will not repeat them here. Since the Court issued that order, which disposed of summary judgment motions, Plaintiff negotiated a settlement of its claims with Defendants and now asks the Court to enter a proposed consent decree formalizing that settlement. (*See generally* Dkt. Nos. 161, 172.) It does so following publication of the decree, *see* Notice of Lodging of Proposed Consent Decree Under the Clean Water Act, 88 Fed. Reg. 83151-01 (Nov. 28, 2023), and its consideration of resulting comments, including those of the Puyallup Tribe and Conservation Groups. (*See* Dkt. Nos. 161-3, 161-4).

According to the decree, Defendants (amongst other requirements) shall pay a civil penalty of $1.025 million (Dkt. No. 161-1 at 7); regularly monitor portions of the river and remove visible turf-related debris, (*id*. at 39–43);[1] establish a restrictive deed on a parcel of land adjacent to the hydroelectric facility, (*id*. at 50–51); seek out a peer review of the proposed spillway replacement project, (*id*. at 55–57); agree to a timetable for removing the temporary rock dam/spillway at issue in a related Endangered Species Act ("ESA") case, *Puyallup Tribe of Indians v. Electron Hydro, LLC*, Case No. C20-1864-JCC (W.D. Wash. 2020);[2] provide a

---

[1] This includes routine foot surveys three miles downstream of the project site and two miles downstream of the powerhouse, (Dkt. No. 161-1 at 39), semi-annual surveys fifteen miles downstream of the project site, (*id*. at 39–40), the removal and disposal of material discovered during those surveys, (*id*. at 40), recordkeeping requirements, (*id*. at 42), the development of reporting tools for the public, (*id*. at 43), publication requirements, (*id*.), and various submission requirements, (*id*. at 45).

[2] In that case, the Court ordered Electron Hydro, LLC (a defendant in this action) to remove a sufficient portion of the rock dam/spillway during the summer 2024 work window to allow for volitional fish passage. *See Puyallup Tribe of Indians v. Electron Hydro, LLC*, 2024 WL 664407, slip op. at 6 (W.D. Wash. 2024). The Court sought and requested supplemental briefing from the parties in this action regarding how that timeline impacts the consent decree as proposed. (*See* Dkt. Nos. 170–173.) The Puyallup Tribe asks that the decree be modified so that the rock timeline required in the ESA case apply with equal force in this matter. (*See generally* Dkt. No. 171). The Court declines to do so. The remedy crafted in that case was intended to resolve an ongoing *ESA* violation. The evidence put forward there has little bearing on how and when removal of the structure would satisfy the *CWA*.

$1,000,000 performance bond to ensure removal of the rock dam/spillway in a timely manner, (*id*. at 64–68); and, if they fail to comply, pay daily penalties ranging from $500–$5,000, depending on the duration of noncompliance and nature of the violation. (*Id*. at 17–18.)

The Puyallup Tribe and Conservation Groups' objections largely track with their public comments. (*Compare* Dkt. Nos. 161-3, 161-4l; *with* Dkt. Nos. 162, 166, 171, 172, 173.) Primarily at issue is the penalty amount and adequacy of the turf management plan, *i.e.*, monitoring and disposal requirements. (*See* Dkt. Nos. 162 at 14–19, 166 at 1–2.)

## II.   DISCUSSION

### A.   Legal Standard

To approve a consent decree, a district court must determine that it is fair, reasonable, and consistent with the objectives of the governing statute. *U.S. v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 743 (9th Cir. 1995). A non-consenting intervenor is "entitled to . . . have its objections heard." *Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 529 (1986). But they do not control. *Sierra Club v. North Dakota*, 868 F.3d 1062, 1066 (9th Cir. 2017) (citing *Int'l Ass'n of Firefighters*, 478 U.S. at 528–29). Where, as here, "a government agency charged with protecting the public interest 'has pulled the laboring oar in constructing the proposed settlement,' more deference to the parties' agreement is due." *Montrose Chem. Corp.*, 50 F.3d at 746 (quoting *U.S v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990)); *see Arizona v. City of Tucson*, 761 F.3d 1005, 1013 (9th Cir. 2014) (suggesting that the court defer to an agency's expertise in such situations).

### B.   Analysis

The CWA's statutory purpose is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). For the reasons described below, the Court FINDS the proposed consent decree's contested terms, namely the financial penalty and turf monitoring requirements now at issue, are consistent with this purpose.

Moreover, the decree (as a whole) is fair,[3] reasonable, and in the public interest.

The decree is procedurally fair because Plaintiff and Defendants negotiated it at arms-length. (*See* Dkt. No. 161 at 7.) And Plaintiff invited public comment, made responsive revisions, and explained its rationale when declining to do so. (*See* Dkt. Nos. 161-2 at 47, 56–57 (revisions); 161 at 8–15 (responses)). The process provided ample and fair consideration for the interests of all concerned. Nevertheless, Plaintiffs-Intervenors take issue with the size of the financial penalty (asserting that it is far too low) and the monitoring and management requirements (claiming that they are insufficient). (*See generally* Dkt. Nos. 162, 166.) This implicates substantive fairness and the public interest.

### 1. Financial Penalty

According to the CWA, this Court must consider the following factors in assessing a civil penalty: (1) the seriousness of the violation; (2) the violator's economic benefit derived from the violation; (3) its history of violations; (4) its good faith efforts to comply; (5) the economic impact of the penalty on the violator; and (6) any other considerations as justice requires. 33 U.S.C. § 1319(d). Like any court, this Court may apply them using a "top-down" or a "bottom-up" approach. *See, e.g.*, *Idaho Conservation League v. Atlanta Gold Corp.*, 879 F. Supp. 2d 1148, 1165 (D. Idaho 2012). The top-down approach starts with the maximum penalty and adjusts downward. *Id.* at 1165–66. The bottom-up approach looks at the economic benefit of the

---

[3] A consent decree must be both procedurally and substantively fair. *Montrose*, 50 F.3d at 743. When measuring procedural fairness, the candor, openness, and bargaining balance in the negotiation process are at issue. *See Washington v. U.S.*, 2007 WL 3025843, slip op. at 6 (W.D. Wash. 2007); *Cannons*, 899 F.2d at 87; *see also U.S. v. Chevron U.S.A., Inc.*, 380 F. Supp. 2d 1104, 111 (N.D. Cal. 2005) (decree is procedurally fair when negotiated in good faith at arms-length among experienced counsel); *U.S. v. PotlatchDeltic Land & Lumber, LLC*, 2024 WL 2013857, slip op. at 1 (D. Idaho 2024) (decree is procedurally fair when the public is provided an opportunity to comment). When measuring substantive fairness, the Court need not determine whether "'the settlement is one which it might have fashioned.'" *U.S. v. P. Gas & Elec.*, 776 F. Supp. 2d 1007, 1025 (N.D. Cal. 2011) (quoting *Cannons*, 899 F.2d at 84) (cleaned up). Instead, it applies "an amalgam of delicate balancing, gross approximations and rough justice." *Conservation N.W. v. Sherman*, 715 F.3d 1181, 1185 (9th Cir. 2013).

violation and adjusts upward. *Id.* Each has its merits, depending on the nature of the case. In instances like here, where the violation is well established but the resulting damage is not, many courts utilize a bottom-up approach. *See. e.g.*, *U.S. v. Mun. Auth. of Union Twp.*, 929 F. Supp. 800, 806 (M.D. Pa. 1996) (bottom-up approach best addresses deterrence); *Student Pub. Int. Rsch. Grp. Of New Jersey, Inc. v. Monsanto Co.*, 1988 WL 156691, slip. op. at 16 (D.N.J. 1988) (top-down approach would "be a novel and wholly untenable principle to apply to any civil penalty statute"); *Idaho Conservation League v. Atlanta Gold Corp.*, 879 F. Supp. 2d 1148, 1166 (D. Idaho 2012) (applying bottom-up approach because the amount of harm was unknown). This Court will do the same.

No doubt, Defendant's use of field turf to line a bypass channel in 2020, along with the other CWA violations described in the Court's prior order (Dkt. No. 149), generated significant harm to the public interest—particularly the Tribe. (*See id.* at 5–17.) But it appears undisputed that Defendants received no economic benefit from the turf violation. (*See generally* Dkt. Nos. 161, 162.) This is not the prototypical scenario, where a violator avoids disposal and compliance costs, or generates ancillary benefits through noncompliance. *See, e.g.*, *U.S. v. Bayley*, 2023 WL 3093126, slip op. at 11 (W.D. Wash. 2023) (improperly sloped bulkhead resulting in additional value to the landowner); *Idaho Conservation League v. Poe*, 2022 WL 4536465, slip op. at 11 (D. Idaho 2022) (additional profits from unpermitted suction dredge mining operation); *Sierra Club v. MasTec N.A.*, 2009 WL 426205, slip op. at 5 (D. Or. 2009) (avoided compliance costs). Therefore, the starting point here is zero.

Of all the violations at issue in this matter, Defendants application of field turf to the diversion channel was a particularly serious one. The Court must fashion a penalty to punish Defendants and deter them from future violation(s). All that said, Defendants received no financial benefit from their use of the turf.[4] And they have no known history of CWA violations.

---

[4] For this reason, the Tribe suggests the Court disregard this factor. (Dkt. No. 162 at 10–11.) The Court declines the request. While this factor does not suggest that an increased penalty is required, the Court may consider it amongst all of the factors (on a holistic basis). *See generally*

ORDER
C20-1746-JCC
PAGE - 5

(*See* Dkt. No. 162 at 11–12.) Nevertheless, the record in this and the ESA cases suggest the turf violation was intentional. And Defendants made no effort to ameliorate the resulting harm until forced to do so—suggesting bad faith. That said, the economic impact of a $1.025 million penalty to Defendants is substantial. From discussions during prior hearings, the Court understands they purchased the facility for approximately $10 million in 2014 and have operated for less than six years since then. This is because the Court has since barred them from generating power at the facility until they obtained the required ESA permits, which they have yet to do. *See Am. Whitewater v. Electron Hydro, LLC*, 2021 WL 2530384, slip op. at 5 (W.D. Wash. 2021). And the Court is mindful of the fact that they separately paid $1 million in criminal penalties and restitution for largely the same conduct. *See Washington v. Electron Hydro LLC*, Case No. 22-1-00044-1, Entry Nos. 59, 60 (Pierce Cnty. Sup. Ct. 2022).

Given these considerations, the Court FINDS $1.025 million to be a substantively fair penalty, which is in the public interest.

### 2. Turf Monitoring and Management

The Tribe has myriad concerns over the monitoring and management provisions. The primary issues are (a) who would do the monitoring, (b) how frequently, and (c) in what area of the river, *i.e.*, how far downstream. The Tribe asks that an independent third party conduct all monitoring, do so frequently, and in an area much further downstream than that included in the decree. (Dkt. No. 162 at 16–17.) But the Court finds the decree's provisions adequate.

As proposed, Defendants must conduct twice-monthly foot surveys proximate to where most of the debris has been found. (*See* Dkt. No. 161-1 at 39–40.) This would be confirmed semi-annually by an EPA-approved contractor. (*Id.*) Plaintiff contends that, when coupled with the required survey work of a much larger area, along with the public reporting and recordkeeping requirements, (*id.* at 42–43), it is highly likely much of the visible pollutant will

---

*U.S. v. Allegheny Ludlum Corp.*, 187 F. Supp. 2d 426, 445 (W.D. Pa. 2002) (applying factors in a flexible manner when utilizing bottom-up approach).

be located. (*See* Dkt. No. 161 at 11–13.) And when it is, the decree ensures prompt removal. (Dkt. No. 161-1 at 40–41.) To the extent debris is buried and, therefore, not visible, the decree requires monitoring when areas of the river are dewatered and excavated. (*Id.* at 41.)

      Plaintiff, in its expert role, has concluded that these provisions, in total, are sufficient to satisfy the CWA's purpose. (*See* Dkt. No. 161 at 7.) And while the Plaintiffs-Intervenors disagree, the argument and evidence they put forth is not convincing, particularly when viewed through the deferential lens permitted here. *See Montrose Chem. Corp.*, 50 F.3d at 746 ("[A] district court reviewing a proposed consent decree 'must refrain from second-guessing the Executive Branch.'") (quoting *Cannon*, 899 F.2d at 84).

### III. CONCLUSION

For the reasons described above, the Court GRANTS Plaintiff's motion to enter the consent decree (Dkt. No. 161). Plaintiff is DIRECTED to provide the Court with an electronic copy of the proposed decree, without the CM/ECF stamp reflected in Docket Number 161-1, for entry. Plaintiffs-Intervenors are DIRECTED to meet and confer with Plaintiff and Defendant and provide the Court with a joint status report ("JSR") within 14 days of this order addressing whether the decree bars Plaintiffs-Intervenors' remaining CWA citizen suit claims.[5] The result of this reporting has no bearing on the Court's finding above that the decree as proposed is fair and in the public interest. The Court only seeks to understand the parties' positions regarding any remaining claims that may remain in this matter to allow it to establish a schedule to adjudicate those claims.

//
//
//
//

---

[5] At issue is whether Plaintiff's efforts in settling *its* claims represent the diligent prosecution necessary to extinguish Plaintiffs-Intervenors' 33 U.S.C. § 1365 citizen suit claim(s). *See P. Gas & Elec.*, 776 F. Supp. 2d at 1029.

DATED this 10th day of July 2024.

John C. Coughenour
UNITED STATES DISTRICT JUDGE