1

2                    **UNITED STATES DISTRICT COURT**

3                   **WESTERN DISTRICT OF WASHINGTON**

4

5

6   _____     )
                                                )
7   UNITED STATES OF AMERICA, *et al*.,         )
                                                )
8            Plaintiffs, and                    )      Case No. 2:20-cv-01746-JCC
                                                )
9   PUYALLUP TRIBE OF INDIANS, *et al*.,        )
                                                )
10           Plaintiff-Intervenors,             )      [PROPOSED]
                                                )      CONSENT DECREE
11               v.                             )
                                                )
12  ELECTRON HYDRO, LLC, and                    )
    THOM A. FISCHER,                            )
13                                              )
             Defendants.                        )
14  _____     )

15

16

17

TABLE OF CONTENTS

1    I.      JURISDICTION AND VENUE ................................................................. 2
2    II.     APPLICABILITY ...................................................................................... 2
3    III.    DEFINITIONS............................................................................................ 3
4    IV.     CIVIL PENALTY ....................................................................................... 5
5    V.      COMPLIANCE REQUIREMENTS ........................................................... 7
6    VI.     REPORTING REQUIREMENTS ............................................................. 11
7    VII.    STIPULATED PENALTIES .................................................................... 14
8    VIII.   FORCE MAJEURE .................................................................................. 18
9    IX.     DISPUTE RESOLUTION ........................................................................ 20
10   X.      INFORMATION COLLECTION AND RETENTION ............................. 23
11   XI.     EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ................. 25
12   XII.    COSTS ...................................................................................................... 27
13   XIII.   NOTICES................................................................................................... 27
14   XIV.    EFFECTIVE DATE .................................................................................. 28
15   XV.     RETENTION OF JURISDICTION .......................................................... 28
16   XVI.    MODIFICATION ...................................................................................... 28
17   XVII.   TERMINATION ....................................................................................... 29
18   XVIII.  PUBLIC PARTICIPATION ..................................................................... 30
19   XIX.    SIGNATORIES/SERVICE....................................................................... 30
20   XX.     INTEGRATION ....................................................................................... 31
21   XXI.    26 U.S.C. SECTION 162(F)(2)(A)(II) IDENTIFICATION .................... 31
22   XXII.   HEADINGS ............................................................................................... 31
23   XXIII.  FINAL JUDGMENT ................................................................................ 31
24   XXIV.   APPENDICES ........................................................................................... 32

1    Plaintiff United States of America ("United States"), on behalf of the United States

2 Environmental Protection Agency ("EPA"), filed a complaint in this action on November 25,

3 2020, and an amended complaint on February 28, 2022, alleging that Defendants, Electron

4 Hydro, LLC ("Electron Hydro") and Mr. Thom A. Fischer, violated Sections 301, 402, and 404

5 of the Clean Water Act ("Act"), 33 U.S.C. §§ 1311, 1342, 1344.  The amended complaint alleges

6 that Defendants discharged pollutants into waters of the United States without authorization and

7 violated permits issued by the United States Army Corps of Engineers ("Corps") and the State of

8 Washington.

9    On May 14, 2021, Communities for a Healthy Bay and Puget Soundkeeper Alliance

10 moved to intervene in this action.  On May 17, 2021, the Court granted the motion.  On August

11 20, 2021, the Puyallup Tribe of Indians also moved to intervene in this action.  On August 26,

12 2021, the Court granted the motion.

13    Defendants have asserted that they have a limited ability to pay the full amount of the

14 civil penalty at one time and have submitted Financial Information to the United States in

15 support of that assertion.  The United States has reviewed this Financial Information and has

16 determined that Defendants have limited financial ability to pay the full amount of the civil

17 penalty at one time.

18    The United States and Defendants ("Settling Parties") recognize, and the Court by

19 entering this Consent Decree finds, that this Consent Decree has been negotiated by the Settling

20 Parties in good faith and will avoid litigation among the Settling Parties and that this Consent

21 Decree is fair, reasonable, and in the public interest.

22    NOW, THEREFORE, with the consent of the Settling Parties, IT IS HEREBY

23 ADJUDGED, ORDERED, AND DECREED as follows:

1          I.          JURISDICTION AND VENUE

2          1.          This Court has jurisdiction over the subject matter of this action, pursuant to

3    28 U.S.C. §§ 1331, 1345, and 1355, and Sections 309(b) and (d) of the Act, 33 U.S.C.

4    §§ 1319(b) and (d), and over the Settling Parties.  Venue lies in this District pursuant to Section

5    309(b) of the CWA, 33 U.S.C. § 1319(b) and 28 U.S.C. §§ 1391(b) and 1395(a), because the

6    violations alleged in the Complaint are alleged to have occurred in, and Defendants conduct

7    business in, this judicial district.  For purposes of this Decree, or any action to enforce this

8    Decree, Defendants consent to the Court's jurisdiction over this Decree, over any such action,

9    and over Defendants, and Defendants consent to venue in this judicial district.

10          2.          For purposes of this Consent Decree, Defendants agree that the Complaint states

11   claims upon which relief may be granted pursuant to Sections 301, 402, and 404 of the CWA, 33

12   U.S.C. §§ 1311, 1342, 1344.

13          II.          APPLICABILITY

14          3.          The obligations of this Consent Decree apply to and are binding upon the United

15   States, and upon Defendants and any successors, assigns, or other entities or persons otherwise

16   bound by law.  The United States and Defendants agree that Defendants' obligations under this

17   Consent Decree are joint and several.

18          4.          No transfer of ownership or operation of the Facility, whether in compliance with

19   the procedures of this Paragraph or otherwise, shall relieve Defendants of their obligation to

20   ensure that the terms of this Decree are implemented.  At least 30 Days prior to such transfer,

21   Defendants shall provide a copy of this Consent Decree to the proposed transferee and shall

22   simultaneously provide written notice of the prospective transfer, together with a copy of the

23   proposed written agreement, to EPA and DOJ, in accordance with Section XIII (Notices).

2

1    Defendants may designate all or any portion of such agreement as Confidential Business

2    Information ("CBI"), in accordance with Paragraph 68.  For any information that Defendants

3    seek to protect as CBI, Defendants shall follow the procedures set forth in 40 C.F.R. Part 2.

4    Defendants must provide a copy of the documents to EPA in which all of the claimed CBI

5    remains visible.  Defendants may also submit a sanitized version of documents that blacks out or

6    removes the information claimed as CBI.  Information claimed as CBI will be protected from

7    disclosure unless EPA makes a formal determination that the information is not entitled to

8    confidential treatment pursuant to the regulations at 40 C.F.R. Part 2.  Any attempt to transfer

9    ownership or operation of the Facility without complying with this Paragraph constitutes a

10   violation of this Decree.

11        5.    Defendants shall provide a copy of this Consent Decree to all officers, employees,

12   and agents whose duties might reasonably include compliance with any provision of this Decree,

13   as well as to any contractor retained to perform work required under this Consent Decree.

14   Defendants shall condition any such contract upon performance of the work in conformity with

15   the terms of this Consent Decree.

16        6.    In any action to enforce this Consent Decree, Defendants shall not raise as a

17   defense the failure by any of their officers, directors, employees, agents, or contractors to take

18   any actions necessary to comply with the provisions of this Consent Decree.

19                          III.    DEFINITIONS

20        7.    Terms used in this Consent Decree that are defined in the Act or in regulations

21   promulgated pursuant to the Act have the meanings assigned to them in the Act or such

22   regulations, unless otherwise provided in this Decree.  Whenever the terms set forth below are

23   used in this Consent Decree, the following definitions apply:

1      "Complaint" means the amended complaint filed by the United States in this action (Dkt.

2  No. 73);

3      "Consent Decree" or "Decree" means this Decree and all appendices attached hereto

4  (listed in Section XXIV);

5      "Clean Water Act," "CWA," or "Act" means the federal Clean Water Act, 33 U.S.C.

6  §§ 1251 *et seq.*, and its implementing regulations;

7      "Date of Lodging" means the date this Consent Decree is filed for lodging with the Clerk

8  of the Court for the United States District Court for the Western District of Washington;

9      "Day" means a calendar day unless expressly stated to be a business day.  In computing

10  any period of time for a deadline under this Consent Decree, where the last day would fall on a

11  Saturday, Sunday, or federal holiday, the period runs until the close of business of the next

12  business day;

13      "Debris" means crumb rubber, turf material (including fibers), geotextile fabric, and high

14  density polyethylene ("HDPE") liner;

15      "Defendants" mean Electron Hydro, LLC, and Mr. Thom A. Fischer;

16      "Diversion" means the water diversion structure, spillway, and intake area of Electron

17  Hydro's hydroelectric facility located within Section 03, Township 16N, Range 06E, Latitude

18  46.90586N, Longitude 122.03954, in Washington State, at approximately river mile 41 of the

19  Puyallup River;

20      "DOJ" means the United States Department of Justice and any of its successor

21  departments or agencies;

22      "EPA" means the United States Environmental Protection Agency and any of its

23  successor departments or agencies;

1      "Effective Date" means the definition provided in Section XIV;

2      "Facility" means Defendants' hydroelectric facility located in the State of Washington

3 within Section 03, Township 16N, Range 06E, Latitude 46.90586N, Longitude 122.03954, at

4 approximately river mile 41 through river mile 31 of the Puyallup River;

5      "Financial Information" means the documentation and other information submitted by

6 Defendants to the United States on September 14, 19, 20, and 25, 2023.

7      "Paragraph" means a portion of this Decree identified by an Arabic numeral;

8      "Settling Parties" means the United States and Defendants;

9      "Section" means a portion of this Decree identified by a Roman numeral;

10      "Spillway Replacement Project" means the project described in the U.S. Army Corps of

11 Engineers' August 8, 2018 verification letter to Electron Hydro authorizing Electron Hydro's

12 proposed project for permit coverage under Section 404 of the CWA, NWS-2016-350 Electron

13 Hydro, LLC (Diversion Repair and Spillway Replacement), and any substitute project proposal

14 for construction or replacement of the existing diversion located at approximately river mile 41;

15 and

16      "United States" means the United States of America, acting on behalf of EPA.

17               IV.    CIVIL PENALTY

18     8.     Defendants shall pay the sum of $1,025,000 as a civil penalty, together with

19 interest accruing from the date on which the Consent Decree is lodged with the Court, at the rate

20 specified in 28 U.S.C. § 1961 as of the Effective Date.  The civil penalty shall be paid in two

21 equal payments of $512,500 each (plus accrued interest), the first within 30 Days of the Effective

22 Date and the second no later than 180 Days from the Effective Date.  Interest shall accrue on the

23 unpaid balance until the civil penalty is paid in full.

1       9.      Defendants shall pay the civil penalty due, together with interest, by FedWire

2 Electronic Funds Transfer ("EFT") to the DOJ account, in accordance with instructions provided

3 to Defendants by the Financial Litigation Unit ("FLU") of the United States Attorney's Office

4 for the Western District of Washington after the Effective Date.  The payment instructions

5 provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number,

6 which Defendants shall use to identify all payments required to be made in accordance with this

7 Consent Decree.  The FLU will provide the payment instructions to:

8      Steve Marmon
9      1800 James St., Suite 201
10      Bellingham, WA 98225
11      (360) 738-9999
12      invoice@electronhydro.com
13
14 on behalf of Defendants.  Defendants may change the individual to receive payment instructions

15 on their behalf by providing written notice of such change to DOJ and EPA in accordance with

16 Section XIII (Notices).

17       10.      At the time of payment, Defendants shall send notice that payment has been

18 made: (i) to EPA via email at cinwd_acctsreceivable@epa.gov or via regular mail at EPA

19 Cincinnati Finance Office, 26 W. Martin Luther King Drive, Cincinnati, Ohio 45268; and (ii) to

20 DOJ via email or regular mail in accordance with Section XIII.  Such notice shall state that the

21 payment is for the civil penalty owed pursuant to the Consent Decree in *United States of America*

22 *v. Electron Hydro, LLC, et al.* and shall reference the civil action number, CDCS Number, and

23 DOJ case number 90-5-1-1-12395.

24       11.      Defendants shall not deduct any penalties paid under this Decree pursuant to this

25 Section or Section VII (Stipulated Penalties) in calculating their federal income tax.

1                        V.       COMPLIANCE REQUIREMENTS

2          12.     Defendants shall comply with Section 301 of the CWA, 33 U.S.C. § 1311, and all

3    permits obtained pursuant to Sections 402 and 404 of the CWA, 33 U.S.C. §§ 1342, 1344, with

4    respect to the Facility.  Except as in accordance with this Consent Decree, Defendants and

5    Defendants' agents, successors, and assigns are enjoined from discharging any pollutant into

6    waters of the United States, unless such discharge complies with the provisions of the CWA and

7    its implementing regulations.

8          13.     Defendants shall comply with all Turf Management Requirements set forth in

9    Appendix A to this Consent Decree.

10         14.     Defendants shall comply with all Stormwater Management Requirements set forth

11   in Appendix B to this Consent Decree.

12         15.     As mitigation, Defendants shall, within 30 Days of the Effective Date, execute a

13   deed restriction ("Restrictive Deed") in the form of Appendix C attached hereto and incorporated

14   by reference, and submit the Restrictive Deed to the Pierce County Auditor for recording in the

15   real property records of Pierce County.  The Restrictive Deed shall provide for preservation in

16   perpetuity of the Electron Hydro property identified as Pierce County Tax Parcel Number

17   0617201001 ("Parcel"), which is located downstream of the existing spillway between

18   approximately river mile 38 and 39 of the Puyallup River.  Defendants shall comply with the

19   terms and conditions of the Restrictive Deed as a requirement of this Consent Decree.  Upon and

20   after the Date of Lodging, Defendants shall ensure that all features on the Parcel, including air

21   space and subsurface, will be preserved in their natural condition, except as expressly provided

22   in Appendix C, and shall prevent any use of the Parcel that will impair or interfere with their

23   natural resource functions and values.

16.     Upon and after the Date of Lodging, Defendants shall not materially alter the Parcel in a manner inconsistent with the intent of the Restrictive Deed.

17.     Defendants shall make reasonable and good faith efforts to cooperate with any organization that seeks to conduct watershed restoration, fish recovery, and/or fish protection projects and associated activities on the Parcel in accordance with Paragraph 5.b of the Restrictive Deed.

18.     Defendants shall comply with all Construction Review Requirements set forth in Appendix D to this Consent Decree.

19.     Defendants shall comply with all Temporary Rock Spillway provisions set forth in Appendix E to this Consent Decree.  Defendants shall, within 30 Days of the Effective Date, execute a performance bond in the form of Exhibit 1 to Appendix E, attached hereto and incorporated by reference.  Defendants shall provide notice under Paragraph 78 of the Consent Decree within 15 Days of such execution.

20.     Defendants shall comply with the independent contractor provisions set forth in Appendix F, including as applicable to Appendices A and B of this Consent Decree.

21.     Any public statement, oral or written, in print, film, or other media, made by Defendants making reference to any efforts undertaken under Paragraphs 13-20 and the accompanying Appendices of this Decree shall include the following language:  "This project was undertaken in connection with the settlement of an enforcement action, *United States of America v. Electron Hydro, LLC, et al.*, taken on behalf of the U.S. Environmental Protection Agency under the Clean Water Act."

22.     Approval of Deliverables.  After review of any plan, report, or other item that is required to be submitted pursuant to this Consent Decree, EPA will in writing: (a) approve the

1   submission; (b) approve the submission upon specified conditions; (c) approve part of the

2   submission and disapprove the remainder; or (d) disapprove the submission.

3        23.     If EPA approves the submission pursuant to Paragraph 22(a), Defendants shall

4   take all actions required by the plan, report, or other document, in accordance with the schedules

5   and requirements of the plan, report, or other document, as approved.  If the submission is

6   conditionally approved or approved only in part pursuant to Paragraph 22(b) or (c), Defendants

7   shall, upon written direction from EPA, take all actions required by the approved plan, report, or

8   other item that EPA determines are technically severable from any disapproved portions, subject

9   to Defendants' right to dispute only the specified conditions or the disapproved portions, under

10   Section IX (Dispute Resolution).

11        24.     If the submission is disapproved in whole or in part pursuant to Paragraph 22(c)

12   or (d), Defendants shall, within 45 Days or such other time as the Settling Parties agree to in

13   writing, correct all deficiencies and resubmit the plan, report, or other item, or disapproved

14   portion thereof, for approval, in accordance with the preceding Paragraphs.  If the resubmission

15   is approved in whole or in part, Defendants shall proceed in accordance with the preceding

16   Paragraph.

17        25.     If a resubmitted plan, report, or other item, or portion thereof, is disapproved in

18   whole or in part, EPA may again require Defendants to correct any deficiencies, in accordance

19   with the preceding Paragraphs, subject to Defendants' right to invoke Dispute Resolution and the

20   right of EPA to seek stipulated penalties.

21        26.     If Defendants elect to invoke Dispute Resolution as set forth in Paragraphs 23 or

22   25, Defendants shall do so by sending a Notice of Dispute in accordance with Paragraph 56

9

1   within 30 Days (or such other time as the Settling Parties agree to in writing) after receipt of the

2   applicable decision.

3         27.    Any stipulated penalties applicable to the original submission, as provided in

4   Section VII, accrue during the 45-Day period or other specified period pursuant to Paragraph 24,

5   but shall not be payable unless the resubmission is untimely or is disapproved in whole or in

6   part; provided that, if the original submission was so deficient as to constitute a material breach

7   of Defendants' obligations under this Decree, the stipulated penalties applicable to the original

8   submission shall be due and payable notwithstanding any subsequent resubmission.

9         28.    <u>Permits</u>.  When any compliance obligation under this Section requires Defendants

10   to obtain a federal, state, or local permit or approval, Defendants shall submit timely and

11   complete applications and take all other actions necessary to obtain all such permits or approvals.

12         29.    <u>Mitigation Certifications</u>.  With regard to the mitigation required by Paragraph 15

13   and Appendix C, Defendants certify the truth and accuracy of each of the following:

14         a.    That, as of the date of executing this Decree, Defendants are not required

15       to perform or develop the mitigation by any federal, state, or local law or regulation and

16       are not required to perform or develop the mitigation by agreement, grant, or as

17       injunctive relief awarded in any other action in any forum;

18         b.    That the mitigation is not mitigation that Defendants were planning or

19       intending to construct, perform, or implement other than in settlement of the claims

20       resolved in this Decree;

21         c.    That Defendants have not received and will not receive credit for the

22       mitigation in any other local, state, or federal enforcement or regulatory action; and

23         d.    That Defendants shall neither generate nor use any pollutant reductions

1    from the mitigation as netting reductions, pollutant offsets, or to apply for, obtain, trade,

2    or sell any pollutant reduction credits.

3                    VI.       REPORTING REQUIREMENTS

4        30.    Defendants shall submit the following reports to EPA at the addresses set forth in

5    Section XIII (Notices):

6            a.       Within 45 Days of completing each instance of Semi-Annual Monitoring

7    in Appendix A after the lodging of this Consent Decree, until termination of this Decree

8    pursuant to Section XVII, Defendants shall submit by e-mail a semi-annual report for the

9    preceding six months that includes:

10           (1)       A list of the names and titles of all employees and contractors

11                     performing obligations under this Consent Decree;

12           (2)       The Semi-Annual Reports required under Appendix A (Turf

13                     Management Requirements);

14           (3)       Notice of any Debris disposed of as required under Section III.C of

15                     Appendix A;

16           (4)       The status of best management practices implemented under

17                     Appendix B (Stormwater Management Requirements), including a

18                     statement as to whether specific dates and/or deadlines were met

19                     during the preceding six months, unless Electron Hydro (i) meets

20                     the eligibility requirements in Special Condition S10.A of the 2020

21                     Construction Stormwater General Permit ("CSWGP") or any

22                     equivalent provision of a future permit; (ii) has submitted a Notice

23                     of Termination ("NOT") in accordance with Special Condition

1       S10.B of the 2020 CSWGP or any equivalent provision of a future

2       permit; and (iii) the termination of its permit coverage is effective

3       consistent with the CSWGP provisions for termination in Special

4       Condition S10 of the 2020 CSWGP or any equivalent provision of

5       a future permit; and

6   (5)  The status of permit applications submitted by Electron Hydro.

7       This status update shall include either (i) a statement that Electron

8       Hydro is no longer seeking permit coverage for the Spillway

9       Replacement Project (as defined in Appendix E), or (ii) a statement

10       that Electron Hydro is diligently seeking permit coverage for the

11       Spillway Replacement Project, along with sufficient detail of the

12       status of the permitting process for EPA to conclude that Electron

13       Hydro has not abandoned seeking permit coverage for the Spillway

14       Replacement Project.

15   b.  The semi-annual report is subject to EPA's Approval of Deliverables

16 process (Paragraphs 22 through 27 of the Consent Decree).  The semi-annual report shall

17 also include a description of any non-compliance with the requirements of this Consent

18 Decree and an explanation of the violation's likely cause and of the remedial steps taken,

19 or to be taken, including dates, to prevent or minimize such violation.  If Defendants

20 violate, or have reason to believe that they may violate, any requirement of this Consent

21 Decree, Defendants shall notify DOJ and EPA in accordance with Section XIII (Notices)

22 of such violation and its likely duration, in writing, within ten business days of the Day

23 either Defendant first becomes aware of the violation, with an explanation of the

1      violation's likely cause and of the remedial steps taken, or to be taken, including dates, to

2      prevent or minimize such violation.  If the cause of a violation cannot be fully explained

3      at the time the report is due, Defendants shall so state in the report.  Defendants shall

4      investigate the cause of the violation and shall then submit an amendment to the report,

5      including a full explanation of the cause of the violation, within 30 Days of the Day

6      either Defendant becomes aware of the cause of the violation.  Nothing in this Paragraph

7      or the following Paragraph relieves Defendants of their obligation to provide the notice

8      required by Section VIII (Force Majeure).

9          31.    Whenever any violation of this Consent Decree or of any applicable permits or

10   any other event affecting Defendants' performance under this Decree may pose an immediate

11   threat to the public health or welfare or the environment, Defendants shall notify EPA in

12   accordance with Section XIII (Notices) as soon as possible, but no later than 24 hours after either

13   Defendant first knew of the violation or event.  This procedure is in addition to the requirements

14   set forth in the preceding Paragraph.

15        32.    Any notice required by Paragraphs 30 or 31 shall simultaneously be provided to

16   the Puyallup Tribe of Indians by email at: Lisa.Anderson@PuyallupTribe-nsn.gov and

17   Russ.Ladley@PuyallupTribe-nsn.gov.

18        33.    Each report submitted by Defendants under this Section shall be signed by Mr.

19   Thom Fischer and an official of Electron Hydro and both signatories must include the following

20   certification:

21        I certify under penalty of perjury that this document and all attachments were prepared
22        under my direction or supervision in accordance with a system designed to assure that
23        qualified personnel properly gather and evaluate the information submitted.  Based on my
24        inquiry of the person or persons who manage the system, or those persons directly
25        responsible for gathering the information, the information submitted is, to the best of my
26        knowledge and belief, true, accurate, and complete.  I have no personal knowledge that

1    the information submitted is other than true, accurate, and complete.  I am aware that
2    there are significant penalties for submitting false information, including the possibility
3    of fine and imprisonment for knowing violations.
4
5          34.    This certification requirement does not apply to emergency or similar

6    notifications where compliance would be impractical.

7          35.    The reporting requirements of this Consent Decree do not relieve Defendants of

8    any reporting obligations required by the Act or implementing regulations, or by any other

9    federal, state, or local law, regulation, permit, or other requirement.

10          36.    Any information provided pursuant to this Consent Decree may be used by the

11    United States in any proceeding to enforce the provisions of this Consent Decree and as

12    otherwise permitted by law.

13                 VII.    STIPULATED PENALTIES

14          37.    Defendants shall be liable for stipulated penalties to the United States for

15    violations of this Consent Decree as specified below, unless excused under Section VIII (Force

16    Majeure).  A violation includes failing to perform any obligation required by the terms of this

17    Decree, including any work plan or schedule approved under this Decree, according to all

18    applicable requirements of this Decree and within the specified time schedules established by or

19    approved under this Decree.

20          38.    <u>Late Payment of Civil Penalty</u>.  If Defendants fail to pay the civil penalty required

21    to be paid under Section IV (Civil Penalty) when due, Defendants shall pay a stipulated penalty

22    of $2,500 per Day for each Day that the payment is late.

23          39.    Compliance Milestones.

24             a.    Excepting reporting violations addressed in Paragraph 40 below, the

25    following stipulated penalties shall accrue per violation per Day for each violation of the

requirements identified in subparagraph 39.b (1)-(8):

<u>Penalty Per Violation Per Day</u>                    <u>Period of Noncompliance</u>

$2,000 .................................................1st through 14th Day
$3,000 ............................................. 15th through 30th Day
$5,000 .................................................31st Day and beyond

b.

(1)    Transfer Provisions in Paragraph 4, specifically the failure to: (a) provide a copy of this Consent Decree to any proposed transferee; (b) provide written notice to the United States at least 30 Days prior to any transfer of ownership or operation of the Facility; or (c) provide a copy of the proposed written agreement with the transferee;

(2)    Compliance requirements as set forth in Paragraph 12 in any way regarding the Spillway Replacement Project and construction staging areas adjacent to or used to further the Spillway Replacement Project;

(3)    Turf Management Requirements as set forth in Paragraph 13 and Appendix A;

(4)    Stormwater Management Requirements as set forth in Paragraph 14 and Appendix B;

(5)    Mitigation and Restrictive Deed provisions as set forth in Paragraphs 15 to 17 and Appendix C;

(6)    Construction Review Requirements as set forth in Paragraph 18 and Appendix D;

1               (7)       Temporary Rock Spillway Requirements as set forth in Paragraphs

2                     1 and 2 of Appendix E; and

3               (8)       Independent Contractor Requirements as set forth in Paragraph 20

4                     and Appendices A, B, and F.

5      40.    <u>Reporting Requirements</u>.  The following stipulated penalties shall accrue per

6  violation per Day for each violation of the reporting requirements of Section VI and any

7  reporting violations included in Appendices A-E:

8     <u>Penalty Per Violation Per Day</u>           <u>Period of Noncompliance</u>

9               $1,500 .................................................1st through 14th Day
10             $2,000 ............................................ 15th through 30th Day
11             $3,000 .................................................31st Day and beyond
12
13      41.    For all other violations of this Consent Decree not addressed by Paragraphs 38-40

14  above, Defendants shall pay a stipulated penalty of $500 that accrues on a per violation, per Day

15  basis.

16      42.    Stipulated penalties under this Section shall begin to accrue on the Day after

17  performance is due or on the Day a violation occurs, whichever is applicable, and shall continue

18  to accrue until performance is satisfactorily completed or until the violation ceases.  Stipulated

19  penalties shall accrue simultaneously for separate violations of this Consent Decree.

20      43.    Defendants shall pay any stipulated penalty within 30 Days of receiving the

21  United States' written demand.

22      44.    The United States may, in the unreviewable exercise of its discretion, reduce or

23  waive stipulated penalties otherwise due it under this Consent Decree.

24      45.    Stipulated penalties shall continue to accrue as provided in Paragraph 41, during

25  any Dispute Resolution, but need not be paid until as follows:

1        a.     If the dispute is resolved by agreement of the Settling Parties or by a

2        decision of EPA that is not appealed to the Court, Defendants shall pay accrued penalties

3        determined to be owing, together with interest, to the United States within 30 Days of the

4        effective date of the agreement or the receipt of EPA's decision or order.

5        b.     If the dispute is appealed to the Court and the United States prevails in

6        whole or in part, Defendants shall pay all accrued penalties determined by the Court to be

7        owing, together with interest, within 60 Days of receiving the Court's decision or order,

8        except as provided in subparagraph c, below.

9        c.     If any Party appeals the District Court's decision, Defendants shall pay all

10       accrued penalties determined to be owing, together with interest, within 15 Days of

11       receiving the final appellate court decision.

12      46.    Defendants shall pay stipulated penalties owing to the United States in the manner

13    set forth in Paragraph 9 and with the confirmation notices required by Paragraph 10, except that

14    the transmittal letter shall state that the payment is for stipulated penalties and shall state the

15    violation(s) for which the penalties are being paid.

16      47.    If Defendants fail to pay stipulated penalties according to the terms of this

17    Consent Decree, Defendants shall be liable for interest on such penalties, as provided for in

18    28 U.S.C. § 1961, accruing as of the date payment became due.  Nothing in this Paragraph shall

19    be construed to limit the United States from seeking any remedy otherwise provided by law for

20    Defendants' failure to pay any stipulated penalties.

21      48.    The payment of penalties and interest, if any, shall not alter in any way

22    Defendants' obligation to complete the performance of the requirements of this Consent Decree.

1    49.    <u>Non-Exclusivity of Remedy</u>.  Stipulated penalties are not the United States'

2    exclusive remedy for violations of this Consent Decree.  Subject to the provisions of Section XI

3    (Effect of Settlement/Reservation of Rights), the United States expressly reserves the right to

4    seek any other relief it deems appropriate for Defendants' violation of this Decree or applicable

5    law, including but not limited to an action against Defendants for statutory penalties, additional

6    injunctive relief, mitigation or offset measures, and/or contempt.  However, the amount of any

7    statutory penalty assessed for a violation of this Consent Decree shall be reduced by an amount

8    equal to the amount of any stipulated penalty assessed and paid pursuant to this Consent Decree.

9                                      VIII.    FORCE MAJEURE

10    50.    "Force majeure," for purposes of this Consent Decree, is defined as any event

11    arising from causes beyond the control of Defendants, of any entity controlled by Defendants, or

12    of Defendants' contractors, that delays or prevents the performance of any obligation under this

13    Consent Decree despite Defendants' best efforts to fulfill the obligation.  The requirement that

14    Defendants exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate

15    any potential force majeure event and best efforts to address the effects of any potential force

16    majeure event (a) as it is occurring and (b) following the potential force majeure, such that the

17    delay and any adverse effects of the delay are minimized.  "Force Majeure" does not include

18    Defendants' financial inability to perform any obligation under this Consent Decree.

19    51.    If any event occurs or has occurred that may delay the performance of any

20    obligation under this Consent Decree, whether or not caused by a force majeure event,

21    Defendants shall provide notice by telephone and by email to EPA, in accordance with the

22    Notice provisions in Section XIII below, within 72 hours of when Defendants first knew or

23    should have known that the event might cause a delay.  Within seven Days thereafter,

18

1   Defendants shall provide in writing to EPA, in accordance with Section XIII (Notices), an

2   explanation and description of the reasons for the delay; the anticipated duration of the delay; all

3   actions taken, including dates, or to be taken to prevent or minimize the delay; a schedule for

4   implementation of any measures to be taken to prevent or mitigate the delay or the effect of the

5   delay; Defendants' rationale for attributing such delay to a force majeure event if they intend to

6   assert such a claim; and a statement as to whether, in the opinion of Defendants, such event may

7   cause or contribute to an endangerment to public health, welfare, or the environment.

8   Defendants shall include with any notice all available documentation supporting the claim that

9   the delay was attributable to a force majeure event.  Failure to comply with the above

10   requirements shall preclude Defendants from asserting any claim of force majeure for that event

11   for the period of time of such failure to comply, and for any additional delay caused by such

12   failure.  Defendants shall be deemed to know of any circumstance of which Defendants, any

13   entity controlled by Defendants, or Defendants' contractors knew or should have known.

14       52.   If EPA agrees that the delay or anticipated delay is attributable to a force majeure

15   event, the time for performance of the obligations under this Consent Decree that are affected by

16   the force majeure event will be extended by EPA for such time as is necessary to complete those

17   obligations.  An extension of the time for performance of the obligations affected by the force

18   majeure event shall not, of itself, extend the time for performance of any other obligation.  EPA

19   will notify Defendants in writing of the length of the extension, if any, for performance of the

20   obligations affected by the force majeure event.

21       53.   If EPA does not agree that the delay or anticipated delay has been or will be

22   caused by a force majeure event, EPA will notify Defendants in writing of its decision.

1   54.   If Defendants elect to invoke the dispute resolution procedures set forth in

2   Section IX (Dispute Resolution), they shall do so no later than 15 Days after receipt of EPA's

3   notice.  In any such proceeding, Defendants shall have the burden of demonstrating by a

4   preponderance of the evidence that the delay or anticipated delay has been or will be caused by a

5   force majeure event; that the duration of the delay or the extension sought was or will be

6   warranted under the circumstances; that best efforts were exercised to avoid and mitigate the

7   effects of the delay; and that Defendants complied with the requirements of Paragraphs 50 and

8   51.  If Defendants carry this burden, the delay at issue shall be deemed not to be a violation by

9   Defendants of the affected obligation of this Consent Decree identified to EPA and the Court.

10                          IX.   DISPUTE RESOLUTION

11   55.   Unless otherwise expressly provided for in this Consent Decree, the dispute

12   resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising

13   under or with respect to this Consent Decree.  Defendants' failure to seek resolution of a dispute

14   under this Section shall preclude Defendants from raising any such issue as a defense to an

15   action by the United States to enforce any obligation of Defendants arising under this Decree.

16   56.   Informal Dispute Resolution.  Any dispute subject to dispute resolution under this

17   Consent Decree shall first be the subject of informal negotiations.  The dispute shall be

18   considered to have arisen when Defendants send DOJ and EPA a written Notice of Dispute.

19   Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal

20   negotiations shall not exceed 20 Days from the date the dispute arises, unless that period is

21   modified by written agreement.  If the Settling Parties cannot resolve a dispute by informal

22   negotiations, then the position advanced by the United States shall be considered binding unless,

1    within 30 Days after the conclusion of the informal negotiation period, Defendants invoke formal

2    dispute resolution procedures as set forth below.

3          57.    <u>Formal Dispute Resolution</u>.  Defendants shall invoke formal dispute resolution

4    procedures within the time period provided in the preceding Paragraph by sending DOJ and EPA

5    a written Statement of Position regarding the matter in dispute.  The Statement of Position shall

6    include, but need not be limited to, any factual data, analysis, or opinion supporting Defendants'

7    position and any supporting documentation relied upon by Defendants.

8          58.    The United States will send Defendants its Statement of Position within 45 Days

9    of receipt of Defendants' Statement of Position.  The United States' Statement of Position shall

10   include, but need not be limited to, any factual data, analysis, or opinion supporting that position

11   and any supporting documentation relied upon by the United States.  The United States'

12   Statement of Position is binding on Defendants, unless Defendants file a motion for judicial

13   review of the dispute in accordance with the following Paragraph.

14         59.    <u>Judicial Dispute Resolution</u>.  Defendants may seek judicial review of the dispute

15   by filing with the Court and serving on the United States a motion requesting judicial resolution

16   of the dispute.  The motion (a) must be filed within fourteen Days of receipt of the United States'

17   Statement of Position pursuant to the preceding Paragraph; (b) may not raise any issue not raised

18   in informal dispute resolution pursuant to Paragraph 56, unless the United States raises a new

19   issue of law or fact in the Statement of Position; (c) shall contain a written statement of

20   Defendants' position on the matter in dispute, including any supporting factual data, analysis,

21   opinion, or documentation, and (d) shall set forth the relief requested and any schedule within

22   which the dispute must be resolved for orderly implementation of the Consent Decree.

60.     The United States shall respond to Defendants' motion within the time period allowed by the Local Rules of this Court.  Defendants may file a reply memorandum, to the extent permitted by the Local Rules.

61.     Standard of Review

        a.     <u>Disputes Concerning Matters Accorded Record Review</u>.  Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 57 pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules, or any other items requiring approval by EPA under this Consent Decree; the adequacy of the performance of work undertaken pursuant to this Consent Decree; and all other disputes that are accorded review on the administrative record under applicable principles of administrative law, Defendants shall have the burden of demonstrating, based on the administrative record, that the position of the United States is arbitrary and capricious or otherwise not in accordance with law.

        b.     <u>Other Disputes</u>.  Except as otherwise provided in this Consent Decree, in any other dispute brought under Paragraph 57, Defendants shall bear the burden of demonstrating that their position complies with this Consent Decree and better furthers the objectives of the Consent Decree.

62.     The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendants under this Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with respect to the disputed matter shall continue to accrue from the first Day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 45.  If

1    Defendants do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as

2    provided in Section VII (Stipulated Penalties).

3                   X.     INFORMATION COLLECTION AND RETENTION

4        63.    Defendants hereby certify that, to the best of their knowledge and belief, after

5    thorough inquiry, they have submitted to the United States Financial Information that fairly,

6    accurately, and materially sets forth their financial circumstances, and that those circumstances

7    have not materially changed between the time the Financial Information was submitted to United

8    States and the time Defendants execute this Consent Decree.

9        64.    The United States and its representatives, including attorneys, contractors, and

10    consultants, shall have the right of entry into any facility covered by this Consent Decree, at all

11    reasonable times, upon presentation of credentials, to:

12            a.    monitor the progress of activities required under this Consent Decree;

13            b.    verify any data or information submitted to the United States in

14    accordance with the terms of this Consent Decree;

15            c.    obtain samples and, upon request, splits of any samples taken by

16    Defendants or their representatives, contractors, or consultants;

17            d.    obtain documentary evidence, including photographs and similar data; and

18            e.    assess Defendants' compliance with this Consent Decree.

19        65.    Upon request, Defendants shall provide EPA or its authorized representatives

20    splits of any samples taken by Defendants.  Upon request, EPA shall provide Defendants splits

21    of any samples taken by EPA.

22        66.    Until five years after the termination of this Consent Decree, Defendants shall

23    retain, and shall instruct their contractors and agents to preserve, all non-identical copies of all

1   documents, records, or other information (including documents, records, or other information in

2   electronic form) in their or their contractors' or agents' possession or control, or that come into

3   their or their contractors' or agents' possession or control, and that relate in any manner to

4   Defendants' performance of their obligations under this Consent Decree.  This information-

5   retention requirement shall apply regardless of any contrary corporate or institutional policies or

6   procedures.  At any time during this information-retention period, upon request by the United

7   States, Defendants shall provide copies of any documents, records, or other information required

8   to be maintained under this Paragraph.

9        67.     At the conclusion of the information-retention period provided in the preceding

10  Paragraph, Defendants shall notify the United States at least 90 Days prior to the destruction of

11  any documents, records, or other information subject to the requirements of the preceding

12  Paragraph and, upon request by the United States, Defendants shall deliver any such documents,

13  records, or other information to EPA.  Defendants may assert that certain documents, records, or

14  other information is privileged under the attorney-client privilege or any other privilege

15  recognized by federal law.  If Defendants assert such a privilege, they shall provide the

16  following:  (a) the title of the document, record, or information; (b) the date of the document,

17  record, or information; (c) the name and title of each author of the document, record, or

18  information; (d) the name and title of each addressee and recipient; (e) a description of the

19  subject of the document, record, or information; and (f) the privilege asserted by Defendants.

20  However, no documents, records, or other information created or generated pursuant to the

21  requirements of this Consent Decree shall be withheld on grounds of privilege.

22       68.     Defendants may also assert that information required to be provided under this

23  Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2.  As to

1   any information that Defendants seek to protect as CBI, Defendants shall follow the procedures

2   set forth in 40 C.F.R. Part 2.

3          69.      This Consent Decree in no way limits or affects any right of entry and inspection,

4   or any right to obtain information, held by the United States pursuant to applicable federal laws,

5   regulations, or permits, nor does it limit or affect any duty or obligation of Defendants to

6   maintain documents, records, or other information imposed by applicable federal or state laws,

7   regulations, or permits.

8                 XI.      EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

9          70.      This Consent Decree resolves only civil claims of the United States for the

10   violations alleged in the Complaint filed in this action through the date of lodging.

11          71.      The United States reserves all legal and equitable remedies available to enforce

12   the provisions of this Consent Decree.  This Consent Decree shall not be construed to limit the

13   rights of the United States to obtain penalties or injunctive relief under the Act or implementing

14   regulations, or under other federal laws, regulations, or permit conditions, except as expressly

15   specified in Paragraph 70.  The United States further reserves all legal and equitable remedies to

16   address any imminent and substantial endangerment to the public health or welfare or the

17   environment arising at, or posed by, the Facility, whether related to the violations addressed in

18   this Consent Decree or otherwise.

19          72.      Notwithstanding any other provision of this Consent Decree, the United States

20   reserves, and this Consent Decree is without prejudice to, the right to reinstitute or reopen this

21   action, or to commence a new action seeking relief in addition to that provided in this Consent

22   Decree, if the Financial Information provided by Defendants, or the certification made by

23   Defendants in Paragraph 63, is false or, in any material respect, inaccurate.

1        73.     In any subsequent administrative or judicial proceeding initiated by the United

2    States for injunctive relief, civil penalties, other appropriate relief relating to the Facility or

3    Defendants' violations, Defendants shall not assert, and may not maintain, any defense or claim

4    based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim

5    preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by

6    the United States in the subsequent proceeding were or should have been brought in the instant

7    case, except with respect to claims that have been specifically resolved pursuant to Paragraph 70.

8        74.     This Consent Decree is not a permit, or a modification of any permit, under any

9    federal, State, or local laws or regulations.  Defendants are responsible for achieving and

10    maintaining complete compliance with all applicable federal, State, and local laws, regulations,

11    and permits, and Defendants' compliance with this Consent Decree shall be no defense to any

12    action commenced pursuant to any such laws, regulations, or permits, except as set forth herein.

13    The United States does not, by its consent to the entry of this Consent Decree, warrant or aver in

14    any manner that Defendants' compliance with any aspect of this Consent Decree will result in

15    compliance with provisions of the Act, or with any other provisions of federal, State, or local

16    laws, regulations, or permits.  Nothing in this Consent Decree shall limit the ability of the Corps

17    to issue, modify, suspend, revoke or deny any individual permit or any nationwide or regional

18    general permit, nor shall this Consent Decree limit the EPA's ability to exercise its authority

19    pursuant to Section 404(c) of the CWA, 33 U.S.C. § 1344(c).

20        75.     This Consent Decree does not limit or affect the rights of Defendants or of the

21    United States against any third parties not party to this Consent Decree, nor does it limit the

22    rights of third parties, not party to this Consent Decree, against Defendants, except as otherwise

23    provided by law.

1    76.    This Consent Decree shall not be construed to create rights in, or grant any cause

2  of action to, any third party not party to this Consent Decree.

3                                   XII.    COSTS

4    77.    The Settling Parties shall bear their own costs of this action, including attorneys'

5  fees.  Should Defendants subsequently be determined by the Court to have violated the terms or

6  conditions of this Consent Decree, Defendants shall be liable for any costs or attorneys' fees

7  incurred by the United States in any action against Defendants for noncompliance with or

8  enforcement of this Consent Decree.

9                                   XIII.    NOTICES

10    78.    Unless otherwise specified in this Decree, whenever notifications, submissions, or

11  communications are required by this Consent Decree, they shall be made in writing and sent by

12  email addressed as follows:

13         As to DOJ by email:              eescdcopy.enrd@usdoj.gov

14                                          Re: DJ # 90-5-1-1-12395

15         As to EPA by email:              soden.caitlin@epa.gov

16                                          bujak.charissa@epa.gov

17                                          R10enforcement@epa.gov

18
19         As to Defendants:                Thom A. Fischer

20                                          thom@tollhouseenergy.com

21                                          Svend Brandt-Erichsen

22                                          sbrandterichsen@nossaman.com

23    79.    Any Settling Party may, by written notice to the other Settling Parties, change its

24  designated notice recipient or notice address provided above.

1    80.    Notices submitted pursuant to this Section shall be deemed submitted upon

2    mailing or transmission by email, unless otherwise provided in this Consent Decree or by mutual

3    agreement of the Settling Parties in writing.

4                              XIV.   EFFECTIVE DATE

5    81.    The Effective Date of this Consent Decree shall be the date upon which this

6    Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted,

7    whichever occurs first, as recorded on the Court's docket.

8                          XV.   RETENTION OF JURISDICTION

9    82.    The Court shall retain jurisdiction over this case until termination of this Consent

10   Decree, for the purpose of resolving disputes arising under this Decree or entering orders

11   modifying this Decree, pursuant to Sections IX (Dispute Resolution) and XVI (Modification), or

12   effectuating or enforcing compliance with the terms of this Decree.

13                              XVI.   MODIFICATION

14   83.    The terms of this Consent Decree, including any attached appendices, may be

15   modified only by a subsequent written agreement signed by all the Settling Parties.  Where the

16   modification constitutes a material change to this Decree, it shall be effective only upon approval

17   by the Court.  Written agreements by the Settling Parties to changes in schedule of less than one

18   year are not material changes.

19   84.    Application for construction grants, State Revolving Loan Funds, or any other

20   grants or loans, or other delays caused by inadequate facility planning or plans and specifications

21   on the part of Defendants shall not be cause for extension of any required compliance date in this

22   Consent Decree.

1        85.     Any disputes concerning modification of this Decree shall be resolved pursuant to

2    Section IX (Dispute Resolution), provided, however, that, instead of the burden of proof

3    provided by Paragraph 61, the Party seeking the modification bears the burden of demonstrating

4    that it is entitled to the requested modification in accordance with Federal Rule of Civil

5    Procedure 60(b).

6                                        XVII.  TERMINATION

7        86.     Either:

8                a.     five years after the Effective Date of this Consent Decree; or

9                b.     after Defendants have completed the requirements of Section V

10                       (Compliance Requirements), have thereafter maintained satisfactory

11                       compliance with this Consent Decree, the CWA, and any permits issued

12                       under Sections 402 or 404 of the CWA, 33 U.S.C. §§ 1342, 1344, for a

13                       period of one year, whichever time period is longer,

14    and Defendants have paid the civil penalty and any accrued stipulated penalties as required by

15    this Consent Decree, Defendants may serve upon the United States a Request for Termination,

16    stating that Defendants have satisfied those requirements, together with all necessary supporting

17    documentation.

18        87.     Following receipt by the United States of Defendants' Request for Termination,

19    the Settling Parties shall confer informally concerning the Request and any disagreement that the

20    Settling Parties may have as to whether Defendants have satisfactorily complied with the

21    requirements for termination of this Consent Decree.  If the United States agrees that the Decree

22    may be terminated, the Settling Parties shall submit, for the Court's approval, a joint stipulation

23    terminating the Decree.

1       88.     If the United States does not agree that the Decree may be terminated, Defendants

2    may invoke Dispute Resolution under Section IX.  However, Defendants shall not seek Dispute

3    Resolution of any dispute regarding termination until 60 Days after service of their Request for

4    Termination.

5                        XVIII. PUBLIC PARTICIPATION

6       89.     This Consent Decree shall be lodged with the Court for a period of not less than

7    30 Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The United States

8    reserves the right to withdraw or withhold its consent if the comments regarding the Consent

9    Decree disclose facts or considerations indicating that the Consent Decree is inappropriate,

10    improper, or inadequate.  Defendants consent to entry of this Consent Decree without further

11    notice and agree not to withdraw from or oppose entry of this Consent Decree by the Court or to

12    challenge any provision of the Decree, unless the United States has notified Defendants in

13    writing that it no longer supports entry of the Decree.

14                       XIX.   SIGNATORIES/SERVICE

15       90.     Each undersigned representative of Defendants, the Deputy Section Chief of the

16    Environmental Enforcement Section and the Section Chief of the Environmental Defense Section for

17    the Environment and Natural Resources Division of the Department of Justice identified on the DOJ

18    signature page below, certifies that he or she is fully authorized to enter into the terms and conditions

19    of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

20       91.     This Consent Decree may be signed in counterparts, and its validity shall not be

21    challenged on that basis.  Defendants agree to accept service of process by mail with respect to

22    all matters arising under or relating to this Consent Decree and to waive the formal service

1   requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any

2   applicable Local Rules of this Court including, but not limited to, service of a summons.

3                                    XX.     INTEGRATION

4        92.     This Consent Decree, including deliverables that are subsequently approved

5   pursuant to this Decree, constitutes the entire agreement among the Settling Parties regarding the

6   subject matter of the Decree and supersedes all prior representations, agreements and

7   understandings, whether oral or written, concerning the subject matter of the subject matter of

8   the Decree herein.

9              XXI.   26 U.S.C. SECTION 162(f)(2)(A)(ii) IDENTIFICATION

10       93.     For purposes of the identification requirement in Section 162(f)(2)(A)(ii) of the

11  Internal Revenue Code, 26 U.S.C. § 162(f)(2)(A)(ii), and 26 C.F.R. § 1.162-21(b)(2),

12  performance of Section II, Paragraph 5; Section V, Paragraphs 12-23 & 28; Section VI,

13  Paragraphs 30, 31, & 33, Section X, Paragraphs 63-67, and Appendices A-F, is restitution,

14  remediation, or required to come into compliance with law.

15                                   XXII.   HEADINGS

16       94.     Headings to the Sections and Subsections of this Consent Decree are provided for

17  convenience and do not affect the meaning or interpretation of the provisions of this Consent

18  Decree.

19                                 XXIII. FINAL JUDGMENT

20       95.     Upon approval and entry of this Consent Decree by the Court, this Consent

21  Decree shall constitute a final judgment of the Court as to the United States and Defendants.  The

22  Court finds that there is no just reason for delay and therefore enters this judgment as a final

23  judgment under Fed. R. Civ. P. 54 and 58.

<div align="center">XXIV. APPENDICES</div>

96.     The following Appendices are attached to and part of this Consent Decree:

"Appendix A" are the Turf Management Requirements;

"Appendix B" are the Stormwater Management Requirements;

"Appendix C" is the Restrictive Deed to be recorded in the real property records of Pierce County;

"Appendix D" are the Construction Review Requirements;

"Appendix E" are the Temporary Rock Spillway Requirements; and

"Appendix F" is the Independent Contractor Certification.

Dated and entered this 11th day of July 2024.

_____
SENIOR UNITED STATES DISTRICT
JUDGE

FOR THE UNITED STATES OF AMERICA:

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

LETITIA GRISHAW
Section Chief
Environmental Defense Section
Environment and Natural Resources Division
U.S. Department of Justice


SUSAN AKERS
Deputy Section Chief
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice


March 29, 2024                *John Broderick*
_____
Date                          JOHN BRODERICK
                              Trial Attorney (MA Bar # 688739)
                              HELEN LI
                              Trial Attorney (CT Bar # 439117)
                              Environmental Enforcement Section
                              SARAH BUCKLEY
                              Senior Attorney (VA Bar # 87350)
                              DANIEL MARTIN
                              Trial Attorney (CA Bar #321570)
                              Environmental Defense Section
                              Environment and Natural Resources Division
                              U.S. Department of Justice
                              Washington, DC 20044-7611
                              (202) 305-0302
                              john.broderick@usdoj.gov

Signature Page for *United States et al. v. Electron Hydro, LLC, et al.*, 2:20-cv-1746          33

FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY:



BEVERLY LI   Digitally signed by BEVERLY LI
Date: 2024.03.22 11:00:29
-07'00'

BEVERLY LI
Regional Counsel
CAITLIN SODEN
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region 10
Office of Regional Counsel
1200 Sixth Avenue, Suite 155, M/S ORC-11-C07
Seattle, Washington 98101-3140
(206) 553-6635

FOR ELECTRON HYDRO, LLC:

MAR 22, 2024
Date

Thom A. Fischer
Manager and Chief Operating Officer

FOR THOM A. FISCHER:

MAR 22, 2024
Date

Thom A. Fischer

# Appendix A

**Appendix A: Turf Management Requirements**

The turf management required by the Consent Decree shall meet the following requirements:

I. **Routine Monitoring**
   a. *Timing*
      i. For a period of three years beginning on the Effective Date, Defendants shall conduct routine foot surveys twice per month at least ten Days apart, and an additional survey within seven Days of each time river flow exceeds 3,000 cfs and then recedes to 1,000 cfs or less.
      ii. If no Debris is observed for three consecutive months of Routine Monitoring, Semi-Annual Monitoring (Section II), or Public Reports (Section VI), Defendants may reduce the frequency of routine surveys to a minimum frequency of once every three calendar months.
      iii. If any Debris is observed at any stretch of the Puyallup River below River Mile (RM) 42 during Semi-Annual Monitoring or if a Public Report of Debris has been made and verified by Defendants, Defendants shall return to the frequency of surveys described in Section I(a)(i).
   b. *Procedure*
      i. Defendants shall survey the river reach on foot between RM 42 and RM 39.2, and RM 31.2 (powerhouse) to 29.2, including the confluence areas of Niesson Creek, Kellog Creek, and Le Dout Creek.  The lateral limit of the surveys shall include the floodplain of a 10,000 cfs event in the Puyallup River.
      ii. Should any portions of the designated survey area be inaccessible at the time a survey is conducted due to high river flows, or cannot be accessed safely due to ice or snow or other physical conditions, the survey team must make a record of the segment(s) it was not able to survey, by river mile, and the reason that each segment could not be surveyed.  If the survey team is not able to access those segments again on its next survey, Defendants shall notify EPA and provide a copy of the records regarding missed survey segments.  At EPA's request, the parties will confer regarding steps to be taken to provide survey coverage for the missed riverbank segment(s).
      iii. Defendants shall use a team of at least four individuals to survey the river during the first survey that is conducted after river flow exceeds 3,000 cfs and then recedes to 1,000 cfs or less.  For all other surveys, Defendants shall use a team of at least two individuals.
      iv. All monitoring paths shall be documented utilizing a Trackstick (or equivalent).

II. **Semi-Annual Monitoring**
   a. *Independent Contractor Hiring Process*
      i. Defendants shall hire an independent and qualified contractor to conduct Semi-Annual Monitoring, subject to EPA's approval of the contractor, which shall not be unreasonably withheld.

    ii. Within 30 Days of the Effective Date, Defendants shall provide for EPA approval the name of a proposed independent and qualified contractor to perform Semi-Annual Monitoring.

    iii. Defendants shall provide the following information for the contractor: (1) resumes of anticipated project leads; (2) a brief statement of qualifications; and (3) a signed certification as provided in Appendix F.

    iv. EPA will review the proposed contractor and will approve or reject the proposed contractor. If EPA rejects the proposed contractor, then within 21 Days, Defendants shall submit for approval an additional contractor. This process will continue until agreement on the contractor is reached.

    v. Within 30 Days of approval by EPA, Defendants shall hire the independent contractor.

    vi. If, at any time after approval, either the United States or Defendants independently determine that the approved contractor cannot satisfactorily perform the required work, then within 30 Days of that determination or receiving the United States' notice of the same, Defendants shall submit to EPA for approval the name and qualifications of another proposed replacement contractor. This process will continue until agreement on the contractor is reached.

*b. Timing*

    i. Defendants' contractor must conduct Semi-Annual Monitoring twice a year during low-flow conditions: (1) once between March and April; and (2) once between September and October, for a period of three years.

*c. Procedure*

    i. The independent contractor shall survey the river reach on foot between RM 42 and RM 26.7, excluding the inaccessible areas of the canyon section above the powerhouse. The independent contractor shall survey the confluence areas of Niesson Creek, Kellog Creek, and Le Dout Creek. The lateral limit of the surveys should include the floodplain of a 10,000 cfs event in the Puyallup River.

    ii. The independent contractor shall use a team of at least four individuals to survey the river. As provided in Appendix F, the team of employees and/or subcontractors of the independent contractor must also meet and comply with the limitations and restrictions in Appendix F.

    iii. All monitoring paths shall be documented utilizing a Trackstick (or equivalent).

**III. Turf Removal**

    a. The survey crews shall remove and properly store for disposal or dispose in accordance with Section IV of this Appendix, all Debris discovered during Routine and Semi-Annual Monitoring if conditions allow safe recovery.

    b. If the survey crew does not recover Debris identified during a survey due to unsafe conditions, Defendants shall investigate within 24 hours of discovery of Debris and recover the Debris if conditions allow safe recovery.

c. If conditions for safe recovery have not occurred within four Days, Defendants shall submit a report to EPA.  The report shall include a plan for recovery for the Debris within seven Days.

d. If Defendants deem any Debris not recoverable, Defendants shall submit a report to EPA.  The report shall include the location of the Debris deemed non-recoverable, photos of the Debris, a detailed narrative of why the Debris cannot be recovered, and what measures Defendants have taken to contain or minimize the impact of such Debris on the river ecosystem.  Defendants shall not rely on the expense of debris recovery as the reason that any Debris is not recoverable.

e. A report that any Debris cannot be recovered is subject to EPA's Approval of Deliverables process (Paragraphs 22 through 27 of the Consent Decree).

f. Buried Turf Excavation and Removal.  Beginning from the Date of Lodging, the next instance in which Defendants isolate for the purpose of dewatering any area below the ordinary high-water mark at the Diversion pursuant to any local, state, or federal permit, it must include as part of the applicable permit application a plan to excavate and remove any turf that has remained buried at the Diversion.  Any work conducted must comply with issued permit(s), as well as all applicable local, state, and federal requirements.  The plan must include the following:

    i. A plan to dewater the river right channel and isolate the work area.

    ii. Description of areas subject to excavation, including at a minimum:

        1. From the toe of the wooden apron, an area 80 feet downstream and at least the width of the wood apron.

        2. From 10 feet upstream of the top edge of the upper fish ladder entrance, an area 40 feet downstream and 100 feet wide.

    iii. Method of excavation.

    iv. Selection of an independent contractor to monitor the excavation and removal who has signed the certification in Appendix F.

g. In the course of construction of the Spillway Replacement Project or any other construction activities at the Facility, and during all normal operational activities, Defendants shall continue to monitor for and remove and properly dispose of all Debris that is or becomes visible in the course of that construction or during normal operational activities.

## IV.     Turf Disposal

a. Proper Disposal of Debris located at Electron Facility

    i. Defendants shall properly dispose of all Debris located at the Electron Facility by transporting Debris to a licensed municipal solid waste facility.  Any Debris shall be transported using a vehicle with covering sufficient to prevent any material from becoming airborne.  Defendants shall not dispose of any Debris until all evidence-retention obligations that Defendants may have in *Puyallup Tribe v. Electron Hydro, LLC, et. al*, No. 2:20-cv-1864 have concluded.

    ii. Defendants shall properly dispose of all Debris collected from the Puyallup River under Section III (Turf Removal) of Appendix A in the same manner.

b. Proper Disposal of Debris collected by Puyallup Tribe of Indians

      i.   At any one time within five years of the Effective Date, the Puyallup Tribe of Indians may request disposal of Debris collected by the Tribe.  Within ninety Days of such request, Defendants shall transport Debris to a licensed municipal solid waste facility using a vehicle with covering sufficient to prevent any material from becoming airborne.

   c.  Defendants shall include notice of any Debris disposed of under this Section in the semi-annual reports required in Paragraph 30 of the Consent Decree, and attach any hauling or disposal manifests notifying the EPA that the requirement has been completed.

**V.**    **Record-keeping for Routine Monitoring and Semi-Annual Monitoring**

   a.  For each instance of Routine Monitoring and Semi-Annual Monitoring, the team performing the monitoring shall create, and Defendants shall maintain, a document with the following information:

      i.   Date, time of day, river stage, and weather conditions during the survey.

      ii.  Photographs of Debris found.

     iii.  A description of each type of Debris found.

     iv.  Occurrence (numerical count of what is found for each Debris type).

      v.  Amount (total amount recovered, both pounds of material and square footage) of Debris.

     vi.  Location and position within the river system (e.g., in-river or riverbank, including specifics of whether found under rock, sand, or log jam).

    vii.  Location (latitude/longitude).

    viii.  Date of removal of Debris.

     ix.  If Debris is not removed on the date found, include the reason the Debris could not be recovered and when it was removed.

      x.  If Debris is deemed not recoverable pursuant to an EPA-approved report under Section III.d-e, include a description of why the Debris cannot be recovered and what measures have been taken to contain or minimize the impact of such Debris on the river ecosystem.

     xi.  Identify lead individual performing monitoring work.

    xii.  Trackstick (or equivalent) records of monitoring paths taken.

**VI.**   **Aerial Survey**

   a.  Before the end of the next in-water work window (July 15 – September 15) after the Effective Date, Defendants shall conduct an aerial survey of the canyon section between the intake and the powerhouse, at approximately RM 36 through RM 35. This survey can occur at a drone safe altitude but shall employ cameras capable of capturing photographic imagery of river conditions in the canyon and spectral imaging camera software trained to recognize classes of debris.  Defendants shall ensure a properly trained technician operates the survey technology.

   b.  Defendants shall maintain video footage of the aerial survey and capture still photographic imagery and the location of any Debris located during the aerial survey.

    c. Defendants shall provide this documentation to EPA within 15 Days of the aerial survey along with a detailed narrative of observations made during the survey.

**VII.**   **Public Reports**

    a. Defendants shall establish a phone line and web reporting tools for members of the public to report observed Debris. Public reporting forms shall not be overly burdensome with excessive fields and tasks, and shall not require any member of the public to submit any personal information along with their report.

    b. Defendants shall check the phone line and web reporting tool at least five Days a week.

    c. Defendants shall track receipt of public reports and include in a record any comments or calls, including date received, description of Debris observed, location of Debris observed, and other relevant metrics. The record shall be accessible by EPA upon demand.

    d. Defendants shall investigate within 24 hours of receiving a Public Report and comply with the procedures in Section III (Turf Removal).

**VIII.**   **Publication of Data**

    a. Defendants shall publish on a public website, to be maintained until the Consent Decree is terminated, the following information related to Appendix A:

        i. All Debris survey reports within 30 Days of survey (Section III.c - III.e).

        ii. All information maintained from Routine Monitoring and Semi-Annual Monitoring (Section V.a).

        iii. Trackstick (or equivalent) records of monitoring path for turf monitoring (Section V.a.xii).

        iv. Aerial Survey footage and images of Debris (Section VI).

        v. All Public Reports received and measures taken to respond (Section VII.c). Such publication shall not include any personal information of individuals who reported.

**IX.**   **CD Reporting**

    a. Defendants shall compile and submit to EPA a report within 45 Days of completing each instance of Semi-Annual Monitoring.

    b. The report shall include the following:

        i. Narrative description of how Defendants met Routine and Semi-Annual Monitoring requirements, including lists of survey dates.

        ii. Identification of any failure to survey, remove, or record Debris.

        iii. Description of any adaptive management strategies employed or any unforeseen challenges encountered and how Defendants addressed such challenges.

        iv. Copies of all information published pursuant to Section VIII.

# Appendix B

## Appendix B: Stormwater Management Requirements

I.  **Review of Best Management Practices (BMPs)**

   a.  *Independent Contractor Hiring Process*

   i.  Defendants shall hire an independent and qualified contractor to identify stormwater management requirements, subject to EPA approval, which shall not be unreasonably withheld.

   ii.  Within 30 Days of the Effective Date, Defendants shall provide for EPA approval the names of a proposed independent and qualified contractor to identify and implement stormwater management requirements.

   iii.  Defendants shall provide the following information for the proposed contractor: (1) resumes of anticipated project leads; (2) a brief statement of qualifications; and (3) a signed certification provided in Appendix F.

   iv.  EPA will review the proposed contractor and will approve or reject the proposed contractor.  If EPA rejects the proposed contractor, then within 21 Days, Defendants shall submit for approval an additional contractor.  This process will continue until agreement on the contractor is reached.

   v.  Within 30 Days of approval by EPA, Defendants shall hire the independent contractor.

   vi.  If, at any time after approval, either the United States or Defendants independently determine that the approved contractor cannot satisfactorily perform the required work, then within 30 Days of that determination or receiving the United States' notice of the same, Defendants shall submit to EPA for approval the name and qualifications of another proposed replacement contractor.  This process will continue until agreement on the contractor is reached.

   b.  *Independent Contractor Review*

   i.  Within 30 Days of hiring, the independent contractor shall review Electron Hydro's operations covered by the Notice of Intent (NOI) submitted to the Washington Department of Ecology for Construction Stormwater General Permit (CSWGP) coverage, review the existing best management practices (BMPs) and control measures at the Facility, and conduct an onsite evaluation of the Facility.

   ii.  Within 90 Days of hiring, based on its onsite evaluation of the Facility, the independent contractor shall evaluate whether Electron Hydro's NOI accurately reflects onsite conditions and includes all operations and areas requiring coverage under the CSWGP.  Should the independent contractor determine that the NOI is inaccurate, it shall submit a report as such to Defendants and EPA.  Within 30 Days, Defendants shall then submit an updated NOI to Washington State Department of Ecology or may initiate dispute resolution under Section IX of the Consent Decree.

   iii.  Within 120 Days of hiring, the independent contractor shall submit a report with recommendations for structural BMPs to Defendants and EPA.

   1.  The independent contractor shall include a digitized map of the areas covered under the CSWGP, and any additional geospatial layers used

as part of the review and analysis of existing BMPs, and additional structural BMPs that may be implemented on-site.

2. The independent contractor shall combine a digitized map and all geospatial layers into a single Environmental Systems Research Institute "ESRI" file geodatabase with an ESRI map file that includes all of the layers used for analysis purposes and burned to a DVD (or other format agreed to by the parties) that is included in the report. The contractor shall include a PDF file that displays all the layers so that users who do not have ESRI's ArcMap program may still view the data.

3. The independent contractor shall include operation and maintenance (O&M) costs. This could be in the form of an O&M manual for each type of BMP selected.

4. The independent contractor shall include a schedule for inspection and maintenance for all BMPs (BMP O&M Plan) for the life of Defendants' coverage under the CSWGP.

c. *Implementation of BMPs*

i. Defendants shall implement the BMPs recommended by the independent contractor within 90 Days of submission of the independent contractor's report to Defendants and EPA.

ii. Should Defendants object to any of the BMP recommendations made by the independent contractor, Defendants may initiate dispute resolution under Section IX of the Consent Decree.

d. *O&M*

i. Defendants shall implement the BMP O&M Plan and maintain site-specific O&M records for the life of coverage under the CSWGP.

## II.    CD Reporting

a. Within 180 Days of completion of the BMPs, Defendants shall provide a comprehensive report to EPA documenting implementation of the BMPs, including photo/video documentation, a narrative description of successful implementation of all BMPs, and any adaptive management or contingencies that may have occurred. Defendants shall also provide to EPA an ESRI map file burned to DVD (or other format agreed to by the parties) with all geospatial layers associated with BMPs study/analysis/report and geospatial layer with all locations of water quality monitoring. Defendants' report is subject to EPA's Approval of Deliverables process (Paragraphs 22 through 27 of the Consent Decree).

## III.    Publication of Data

a. Defendants shall publish on a public website, which Defendants shall maintain until the Consent Decree is terminated, the following information:

i. This Consent Decree and its Appendices.

ii. Ecology Administrative Order #19624, including subsequent amendments or changes made to the Order.

  iii. The independent contractor's report pursuant to Section I.b.iii of this Appendix.

  iv. GIS PDF showing structural stormwater BMPs (design, location), including subsequent amendments or changes.

  v. GIS PDF showing locations of all water quality monitoring, including subsequent amendments or changes.

  vi. All water quality monitoring data completed under the CSWGP and an explanation for any missing data.

b. Defendants shall publish all information required under this Section III on the same public website as the information required to be published under Appendix A, Section VIII.a, a link to which shall be available at http://electronhydro.com/.

# Appendix C

## DECLARATION OF RESTRICTIVE DEED FOR CONSERVATION

This DECLARATION OF RESTRICTIVE DEED, made this _____ day of _____, 20___, by Electron Hydro, LLC (hereinafter "Grantor");

WHEREAS, Grantor is the fee simple owner of a certain tract of land located between approximately river mile 40 and 37 of the Puyallup River in Pierce County, Washington identified as Tax Parcel 0617201001, with the legal description as follows, and hereinafter referred to as the "Parcel":

> That portion of the east half of the northeast quarter of section 20, township 17 north, range 6 east, W.M., lying westerly of the easterly boundary of the Puyallup River;

WHEREAS, the United States of America initiated legal action pertaining to alleged violations of the Clean Water Act at Electron Hydro, LLC's hydroelectric facility located in the State of Washington within Section 03, Township 16N, Range 06E, Latitude 46.90586N, Longitude 122.03954, at approximately river mile 41 through river mile 31 of the Puyallup River in the United States District Court for the Western District of Washington as Case Number 2:20-cv-01746 (the "Legal Action"); and

WHEREAS, in resolution of the Legal Action, the United States District Court has entered a Consent Decree lodged on November 20, 2023, which requires the Grantor, among other things, to record this Restrictive Deed;

NOW, THEREFORE, in consideration of the terms, conditions, and restrictions contained herein, and pursuant to the laws of the State of Washington, Grantor does agree to the following terms and conditions:

1. **Parties**:  "Grantor" shall mean Electron Hydro, LLC and any subsequent successors or owners of any property interest in the Parcel.  "EPA" shall mean the United States Environmental Protection Agency or any successor agencies.

2. **Purpose**:  The purpose of this Restrictive Deed is to preserve and protect native flora, fauna, soils, water table and drainage patterns, and other conservation values including by protecting riparian areas.  This Restrictive Deed is intended to ensure that all features on the Parcel, including air space and subsurface, will be preserved in their natural condition, except as expressly provided herein, and shall thus prevent any use of the Parcel that will impair or interfere with their natural resource functions and values.

3. **Duration**:  Unless modified as set forth herein, this Restrictive Deed shall remain in effect in perpetuity and shall run with the land regardless of ownership or use, and is binding upon all subsequent owners, their heirs, executors, administrators, successors, representatives, devisees, and assigns, as the case may be, as long as said party shall have any interest in any part of the Parcel.

4.    **Activity and Use Limitations**:  Unless otherwise allowed in Paragraph 5 below, the use of the Parcel is hereby restricted to effectuate the Consent Decree entered in *United States v. Electron Hydro, LLC*, 2:20-cv-1746 (W.D. Wash) ("Consent Decree") and preserve the Parcel in its natural condition to prevent any use of the Parcel that will impair or interfere with natural resource functions and values.  This restriction includes but is not limited to the following activities and uses, which are expressly prohibited in, on, over, or under the Parcel:

    i.    Logging, clearing, mowing, cutting, pruning, or removal of vegetation of any kind; disturbance, destruction, or the collection of any trees, shrubs, or other vegetation; except for control of non-native species and noxious weeds, or scientific or nature study; for fire control, fuel management, or fire hazard abatement; or in connection with restoration projects allowed under Paragraph 5.b.iii, below;

    ii.    construction of man-made structures including but not limited to the construction, removal, placement, preservation, maintenance, alteration, or decoration of any buildings, roads, utility lines, billboards, or other advertising.  This restriction does not include deer stands, bat boxes, bird nesting boxes, bird feeders, duck blinds, and the placement of signs for safety purposes or boundary demarcation, or the maintenance of existing roads described in Paragraph 5 below;

    iii.    removal, excavation, disturbance, or dredging of soil, sand, peat, gravel, or aggregate material of any kind; or any change in the topography of the land, including any discharges of dredged or fill material, ditching, extraction, drilling, driving of piles, mining, or excavation of any kind, except in connection with allowed activities under Paragraph 5, below;

    iv.    drainage or disturbance of the water level or the water table;

    v.    storing, dumping, depositing, abandoning, discharging, or releasing of any gaseous, liquid, solid, or hazardous waste substance, yard waste, materials or debris of whatever nature on, in, over, or underground or into surface or ground water;

    vi.    planting or introduction of non-native species;

    vii.    use of herbicides, insecticides, or pesticides, or other chemicals, except for as may be necessary to control invasive species that threaten the natural character of the Parcel.  State-approved municipal application programs necessary to protect the public health and welfare are not included in this prohibition;

    viii.    conversion of, or expansion into, any portion of the Parcel for use of agriculture, horticulture, aquaculture, silviculture, livestock production or grazing activities.  This prohibition also includes conversion from one type of these activities to another (e.g., from agriculture to silviculture);

ix.     other acts, uses, excavation, or discharges that adversely affect fish or wildlife habitat or the preservation of lands, waterways, or other aquatic resources within the Parcel; or

x.     recreational use of ATVs, dirt bikes, motorcycles, off-road vehicles, or motor vehicles of any kind within the Parcel, except in connection with allowed uses under Paragraph 5, below.

5.    **Allowed Uses**:

a.    This Restrictive Deed shall not prevent the Grantor and the personal representatives, heirs, successors, and assigns of the Grantor from performing activities on the Parcel or from engaging in uses that are not restricted herein and are not otherwise inconsistent with the purpose of this Restrictive Deed.

b.    For the avoidance of doubt, the following activities are allowed on the Parcel:

i.     passive uses such as non-motorized recreation, horseback riding, scientific resource monitoring, surveying and geo-testing;

ii.     use of existing roads by motorized vehicles and, subject to the requirement of Paragraph 6 below, the clearance of vegetation from existing roads on the Parcel, including a roadside swale of no more than ten feet for each existing road, and maintenance of stormwater runoff management features in accordance with any other applicable local, state, and federal requirements; and

iii.     restoration projects and associated activities on the Parcel conducted by Grantor or by organizations approved by Grantor to conduct watershed restoration, fish recovery, and/or fish protection projects, such approval not to be unreasonably withheld.  Restoration projects can include, but are not limited to, floodplain and wetland reconnection, riparian buffer enhancement (including, but not limited to, planting trees, log jams, and brush), large wood installations, and fish passage enhancement and barrier removal.  Grantor shall notify EPA of any application to conduct a restoration project.

c.    This Deed Restriction shall not authorize or require Grantor to grant public access to the Parcel, except as provided in Paragraph 7 below.

6.    Should Grantor and the personal representatives, heirs, successors, and assigns of Grantor undertake road maintenance under Paragraph 5.b.ii above, then it or they must ensure that the road – by upgrading as necessary – meets all Washington State BMPs for forest roads, including but not limited to standards for water crossing structures.  Any crossing of waters classified as Type F under Washington's Forest Practices Rules must accommodate passage of aquatic life at all life stages.

7.    **Access**:  Representatives of EPA and the State of Washington shall have the right to enter and go upon the Parcel, to inspect the Parcel, and to take actions necessary to verify compliance with this Restrictive Deed.  When practicable, such entry shall be upon prior reasonable notice to the owner(s) of the Parcel.  The Puyallup Tribe of Indians may join the

representatives of EPA on any inspection of the Parcel to determine compliance with this Restrictive Deed.  Any organization approved by Grantor to conduct a restoration project, as allowed in Section 5.b.iii above, shall have controlled access to the Parcel to plan and conduct its restoration project and associated activities on the Parcel as per the approval.

8.  **Notification of Violation of Restrictive Deed**:  If Grantor becomes aware of any event or action that constitutes or may constitute a breach of this Restrictive Deed, Grantor shall notify EPA within 15 days of becoming aware of the event or action, and shall remedy any breach of this Restrictive Deed within 30 days of becoming aware of the event or action, or such other time as may be reasonable to remedy the breach, or as agreed to by Grantor and EPA.

9.  **Enforcement**:  The Grantor grants to EPA a discretionary right to enforce this Restrictive Deed in a judicial action against any person(s) or other entity(ies) violating or attempting to violate this Restrictive Deed: provided, however, that no violation of this Restrictive Deed shall result in a forfeiture or reversion of title.  In any enforcement action, an enforcing agency shall be entitled to a complete restoration for any violation, as well as any other judicial remedy available.

   a.  Notwithstanding its rights to enforce this Restrictive Deed, EPA shall be entitled to any other judicial or administrative remedy available at law, such as civil or criminal penalties.

   b.  Omissions or delays on the part of EPA or any enforcing agency at any time in enforcement of any term of this Restrictive Deed shall not constitute a waiver of the right to enforce.

10.  **Recordation and Notice to EPA**:  The Grantor agrees to record this Restrictive Deed in the Land Records of Pierce County for the Parcel and provide EPA with notice of recordation within 15 days of recording.

11.  **Modifications**:  No changes or alterations to this Restrictive Deed shall be made without prior written approval of EPA.  Grantor shall record any amendment with the Land Records of Pierce County within 15 days of any agreed modification and provide EPA with a copy of the recordation within 15 days of recording.

12.  **Termination**:  This Restrictive Deed and the activity and use limitations contained therein are perpetual unless EPA determines that the intended benefits of this Restrictive Deed can no longer be realized and it is so ordered by a court, or by consent of Grantor and EPA. All costs of terminating this Restrictive Deed, including the cost of any remediation or violations of this Restrictive Deed, shall be borne by the party seeking such termination.

13.  **Notice of Transfer of Property Interests**:  Nothing in this Restrictive Deed shall prevent Grantor from selling, transferring, encumbering, or taking other action pertaining to the Parcel unless it is inconsistent with or prohibited by this Restrictive Deed.  The Grantor shall provide written notice and a copy of the Restrictive Deed to any successor in interest prior to the transfer of any property interest in the Parcel, and send such written notice to EPA.  No transfer of the rights of this Restrictive Deed, or of any other property interests pertaining to the Parcel, shall occur without 30 calendar days prior written notice to EPA.  All subsequent transferees,

purchasers, lessees, or possessors of the Parcel shall be deemed by their acceptance of title or other property interest in the Parcel to be in accord with the provisions of this Restrictive Deed.

       14.    **<u>Notices</u>**:  All notices required or allowed to be given hereunder shall be in writing sent via email to the appropriate address indicated below or at such other place or places as Grantor or EPA may, from time to time designate in a written notice provided to the other.

As to EPA by email:   bujak.charissa@epa.gov

                     soden.caitlin@epa.gov

                     R10enforcement@epa.gov

As to Defendants:    Thom Fischer: thom@tollhouseenergy.com

       15.    **<u>Severability:</u>**  If any portion of this Restrictive Deed, or the application thereof to any person or circumstance, is found to be invalid, the remainder of the provisions of this Restrictive Deed, or application of such provision to persons or circumstances other than those as to which it is found to be invalid, as the case may be, shall not be affected thereby.

       16.    **<u>Effective Date</u>**:  The effective date of this Restrictive Deed shall be the date the fully executed instrument is recorded at the county recorder's office.

# Appendix D

## Appendix D: Construction Review Requirements

I.   **Review of Spillway Replacement Project**

Defendants have proposed, and the United States has agreed, that Defendants shall hire Northwest Hydraulic Consultants ("Northwest Hydraulics") to conduct a peer review of Defendants' proposed Spillway Replacement Project and materials in support of Defendants' application for permit coverage under Section 404 of the Clean Water Act. Northwest Hydraulics will review these materials as described below and provide a report for submission to the Parties to this Consent Decree. Defendants are then required to submit Northwest Hydraulics' Construction Review Report to the U.S. Army Corps of Engineers ("Corps") as a supplement to Defendants' permit application. The Construction Review Report requirement described in subpart a.ii below applies to any and all applications to complete the Spillway Replacement Project until termination of the Consent Decree pursuant to Section XVII.

a.  *Contractor Review*

   i.  *Review.* Defendants shall provide to Northwest Hydraulics for review their Spillway Replacement Project documents, plans, designs and specifications, construction sequencing, associated operations guidelines and approaches, and any other materials Defendants have submitted or intend to submit in support of their CWA Section 404 permit application.

   ii. *Report.* Defendants shall direct Northwest Hydraulics to create a report ("Construction Review Report") within 30 Days of receiving the documents listed in Paragraph a.i above that includes:

   A.  The pros and cons of all aspects of the existing plans, designs and specifications, construction sequencing, and associated operations guidelines and approaches, including direct and secondary environmental impacts to aquatic resources, and estimated project longevity.

   B.  Information on availability of alternative plans, designs and specifications, construction sequencing, and associated operations guidelines or approaches that would work better, last longer, and/or avoid or have equal or fewer impacts to aquatic resources at the Diversion and in downstream reaches of the Puyallup River.

   C.  A comparison of such alternative approaches with existing plans, designs and specifications, construction sequencing, associated operations guidelines, and approaches with regard to all aspects of the project, including direct, secondary, cumulative, and temporal environmental impacts, and project longevity.

   D.  An assessment of whether the existing plans, designs and specifications, construction sequencing, and associated operations guidelines or approaches consider reasonably foreseeable changes that might result in additional environmental impacts should those changes come to pass. If the existing plans, designs and specifications, construction sequencing, and associated operations

guidelines or approaches do not consider such reasonably foreseeable changes, then the Construction Review Report must include an evaluation of such information, including how this information should be incorporated into the existing plans, designs and specifications, construction sequencing, and associated operations guidelines or approaches.  If such reasonably foreseeable changes are considered in the existing plans, designs and specifications, construction sequencing, and associated operations guidelines or approaches, then the Construction Review Report must include an evaluation of the adequacy of such consideration.

E. In light of the seasonal patterns of discharge and the power of the Puyallup River, an evaluation of what measures are necessary to minimize impacts and risks associated with any choice of design, including consideration of short and long-term impacts to: (1) water quality; (2) adult and juvenile fish, including their ability to migrate upstream and downstream; (3) channel system functioning at the Diversion, as well as upstream and downstream of the Diversion, including downstream ecological functions and services; and (4) the larger Puyallup River watershed, as appropriate.

F. For all design alternatives, an explanation and comparison of the short- and long-term implications of the design choice(s) on energy production, on health of juvenile and adult fish, and on overall maintenance of the ecosystem structure, functioning, and health of the Puyallup River.

iii. *Submission*.  Defendants shall provide a copy of the Construction Review Report to EPA as soon as they receive it from Northwest Hydraulics.

iv. Within 30 Days of completion of the Construction Review Report, Defendants shall provide to EPA a written explanation as to whether they have adopted any of the alternatives identified by Northwest Hydraulics in the Construction Review Report, in whole or in part.  Defendants must include a justification for any decision to deviate or to not adopt alternatives from the Construction Review Report.

v. Within 30 Days of providing the report identified in Paragraph I.a.iv., Defendants shall meet and confer with EPA to discuss the Construction Review Report and Defendants' justification, if any, for deviating from or not adopting alternative identified by Northwest Hydraulics in the Construction Review Report.

vi. Defendants shall submit the Construction Review Report to the Corps as part of their CWA Section 404 permit application materials.

II. **Independent Laboratory Testing of Bladder Dam Rubber for 6PPD and 6PPD-quinone**

a. Defendants shall collect and submit a sample of rubber from the bladder dam (that Defendants intend to use as part of any spillway replacement project) for an independent laboratory analysis.  At a minimum, the laboratory analysis must test

for the presence and concentration of 6PPD-quinone and for the presence of 6PPD in the bladder dam rubber.

b. Within five Days of receipt of the sampling results above, Defendants shall send the sampling results to the United States and the Puyallup Tribe of Indians in accordance with Paragraph 32 and Section XIII (Notices) of the Decree.

c. Defendants shall submit the sampling results required under this Section II to the Corps as part of any application for a permit to complete any project that involves use of the bladder dam.

# Appendix E

## Appendix E: Temporary Rock Spillway

**Definitions**

Spillway Replacement Project: the project described in the U.S. Army Corps of Engineers' August 8, 2018 verification letter to Electron Hydro authorizing Electron Hydro's proposed project for permit coverage under Section 404 of the CWA, NWS-2016-350 Electron Hydro, LLC (Diversion Repair and Spillway Replacement), and any substitute project proposal for construction or replacement of the existing spillway located at approximately river mile 41.

Diversion: the water diversion structure, spillway, and intake area of Electron Hydro's hydroelectric facility located within Section 03, Township 16N, Range 06E, Latitude 46.90586N, Longitude 122.03954, in Washington State, at approximately river mile 41 of the Puyallup River.

Temporary Fill: the rock and other fill material discharged in October 2020 as a part of Electron Hydro's efforts to stabilize the Diversion and surrounding area, referred to in the Pierce County Settlement Agreement as the "rock sill dam," and the rock and other fill material discharged at the Diversion in August 2021 as a part of the 2021 Fish Passage Enhancement Project.

**Obligations and Remedies**

1.    Electron Hydro shall not resume hydroelectric operations until the Temporary Fill has been removed and replaced with the Spillway Replacement Project.

2.    Electron Hydro shall remove the Temporary Fill from the Puyallup River within one year or two in-water construction periods, whichever is longer, of final permitting decisions by federal, state, and county agencies, including any judicial review, that authorize completion of a Spillway Replacement Project in the Puyallup River at the Diversion.

3.    Upon receipt of each semi-annual report required under Consent Decree Paragraph 30, EPA shall determine that Electron Hydro is either diligently seeking permit coverage for a Spillway Replacement Project or is no longer diligently seeking permit coverage for a Spillway Replacement Project.  If EPA determines that Electron Hydro is no longer diligently seeking permit coverage for the Spillway Replacement Project, it shall notify Electron Hydro in writing of its decision.  This provision is subject to the Dispute Resolution provisions in Section IX of the Consent Decree.

4.    Effective upon the date of EPA's written notice, or the completion of any dispute resolution process, Electron Hydro shall submit an application for an Alternative Stabilization Project consistent with Paragraph 5 below within 180 Days of that notice.  Provided, however, that nothing in this Paragraph alters the requirements of or Electron Hydro's obligations under Paragraphs 1–2 or 6–8 hereof.

5.      <u>Alternative Stabilization Project</u>. The purpose of the Alternative Stabilization Project referred to in this Appendix will be to remove the Temporary Fill and stabilize the west (left) bank of the Puyallup River and concrete abutment wall at the Diversion in the absence of a Spillway Replacement Project.  To the extent practicable, the Alternative Stabilization Project must not interfere with Electron Hydro's right to draw water consistent with all applicable state and federal laws.

      a.      Any Alternative Stabilization Project that Electron Hydro will apply for under Paragraph 3 shall provide for the removal of the Temporary Fill, unless EPA or the United States Army Corps of Engineers (Corps) determines that retaining all or any part of the Temporary Fill is consistent with the design of and performance criteria for the Alternative Stabilization Project.

      b.      Any Alternative Stabilization Project must, to the maximum extent practicable:

          i.      Minimize the footprint of the site stabilization measures while maximizing natural river structure and function.
          ii.      Minimize thermal and flow volume impacts to fish and other aquatic species.
          iii.      As applicable, ensure downstream fish passage.

      c.      Any Alternative Stabilization Project must, to the maximum extent practicable, avoid:

          i.      Significant and discernable changes to the patterns of water flow and circulation within this reach of the river.
          ii.      Reducing the reach of waters of the United States including within the stabilization area.
          iii.      Significant scour erosion immediately downstream along the channel banks.
          iv.      Impediments, including through disconnection and/or fragmentation, to fish ladder access.

      d.      Electron Hydro's failure to submit an application under Paragraph 4 or failure to meet the performance standards of this Paragraph or subparagraphs shall be grounds for the United States to declare a Contractor Default under the Performance Bond addressed by Paragraph 7.

6.      <u>Permitting and Other Requirements</u>. The provisions of this Appendix are not, and shall not be construed to be, a permit issued under any law.  All work performed under these provisions shall be performed in accordance with the requirements of all applicable laws and permits.  To perform the work set forth in the Alternative Stabilization Project, Electron Hydro shall obtain and fully comply with all

necessary permits and authorizations required by federal, state, and local regulatory bodies, including, but not limited to those listed below.  Identifying, obtaining, and fully complying with all necessary permits and authorizations remains the sole responsibility of Electron Hydro.

    a.    Permits that may be necessary include:

        i.    CWA Section 404 permit from the Corps to discharge dredge or fill material into waters of the United States, including any necessary after-the-fact permit in the event that any rock fill is determined to be consistent with the design of and performance criteria for the Alternative Stabilization Project and retained. Performance of the work required in this Appendix shall include any compensatory mitigation required by applicable CWA permits Electron Hydro may obtain for implementing any Alternative Stabilization Project.

        ii.    Any National Pollutant Discharge Elimination System Permit necessary for construction of the project (such as the Construction Stormwater General Permit) from the Washington State Department of Ecology.

        iii.    Authorizations, permissions, or easements necessary to conduct work to complete any Alternative Stabilization Project.

        iv.    All species and habitat protection measures required by federal, state, and local regulatory bodies.

    b.    Electron Hydro's failure to perform any of the requirements of this Paragraph or subparagraphs shall be grounds for the United States to declare a Contractor Default under the Performance Bond addressed by Paragraph 7.

7.   <u>Financial Assurance</u>. Fulfillment of Electron Hydro's obligations under this Appendix shall be secured by the Performance Bond attached as Exhibit 1 to this Appendix.  In accordance with the provisions of this Appendix, the United States shall have the authority to declare a contractor default in accordance with the terms of the Performance Bond.  Electron Hydro agrees not to object to the United States' exercise of its rights to declare a default and to seek performance by the Surety under Section 5 of the Performance Bond for work required under this Appendix.  For the avoidance of doubt, the Settling Parties further affirm that this Appendix, along with a separate and independent settlement agreement between Electron Hydro and Pierce County, constitutes the "Contract" (also, "Construction Contract") for purposes of the Performance Bond and all riders to the Bond.  Electron Hydro has an obligation to perform and is liable under the "Contract", and there is no payment owed by the United States, the U.S. Environmental Protection Agency, or Pierce County to Electron Hydro or the Surety under the "Contract," the Performance Bond, or any rider to the Bond.  The United States will not receive or direct the use of any funds that may be paid by the Bond Surety under Paragraph 5.4 of the Bond.

8. <u>Temporary access and releases</u>.

   a.  Electron Hydro grants and conveys a temporary right-of-entry with the right of ingress and egress onto the Diversion to facilitate the performance of the Alternative Stabilization Project by the Surety of the Performance Bond described in Paragraph 7 and Exhibit 1 to this Appendix, and/or any contractor engaged by the Surety to perform the obligations covered by the Performance Bond, and to any owner of the Performance Bond or any contractor engaged by the Bond owner(s) to perform the obligations covered by the Performance Bond.

   b.  Should Pierce County or its agents take any remedial action due to Electron Hydro's failure to perform the obligations covered by the Performance Bond and the Parties' underlying agreements, Electron Hydro agrees to release Pierce County from any and all claims for property damage, except to the extent of any gross negligence or intentional misconduct of Pierce County, its agents or contractors.

Exhibit 1 – Performance Bond and Riders

Exhibit 1 to Appendix E

# ☘ **AIA**® Document A312™ – 2010

## *Performance Bond*

Bond No.  BDTO-600103-021

**CONTRACTOR:**
*(Name, legal status and address)*

ELECTRON HYDRO, LLC
1800 JAMES STREET, SUITE 201,
BELLINGHAM, WA.  98225

**OWNER:**
*(Name, legal status and address)*
PIERCE COUNTY

**SURETY:**
*(Name, legal status and principal place of business)*
LIBERTY MUTUAL INSURANCE COMPANY
175 BERKELEY STREET,
BOSTON, MA  02116

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

AIA Document A312–2010 combines two separate bonds, a Performance Bond and a Payment Bond, into one form. This is not a single combined Performance and Payment Bond.

**CONSTRUCTION CONTRACT**   SETTLEMENT AGREEMENT
Date:  FEBRUARY 5TH, 2021
Amount: ()   Dollars

Description:
*(Name and location)*
SUPPLY & INSTALL FISH SCREEN AT ELECTRON HYDRO ELECTRIC
PROJECT LOCATED NEAR THE TOWN OF KAPOWSIN,  WASHINGTON

**BOND**
Date:  FEBRUARY 5TH, 2021
*(Not earlier than Construction Contract Date)*

Amount: Dollars   ONE MILLION DOLLARS AND 00/100 ($1,000,000.00)

Modifications to this Bond:   ☐ None      ☒ See Section 16

| CONTRACTOR AS PRINCIPAL | SURETY |
|---|---|
| Company:          *(Corporate Seal)* | Company:          *(Corporate Seal)* |
| ELECTRON,HYDRO, LLC | LIBERTY MUTUAL INSURANCE COMPANY |
| Signature: | Signature: |
| Name   Thom A. Fischer | Name   Attorney-in-Fact |
| and Title:  COO, MANAGER | and Title:  BLAINE HUTTON , SENIOR UNDERWRITING SPECIALIST |

*(Any additional signatures appear on the last page of this Performance Bond.)*

*(FOR INFORMATION ONLY — Name, address and telephone)*

**AGENT or BROKER:**

AON REED STENHOUSE INC. ,
200 EAST RANDOLPH STREET,
CHICAGO, ILLINOIS  60601
SUSAN WELSH,
REGIONAL DIRECTOR OF OPERATIONS

**OWNER'S REPRESENTATIVE:**
*(Architect, Engineer or other party:)*

**§ 1** The Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner for the performance of the Construction Contract, which is incorporated herein by reference.

**§ 2** If the Contractor performs the Construction Contract, the Surety and the Contractor shall have no obligation under this Bond, except when applicable to participate in a conference as provided in Section 3.

**§ 3** If there is no Owner Default under the Construction Contract, the Surety's obligation under this Bond shall arise after

.1    the Owner first provides notice to the Contractor and the Surety that the Owner is considering declaring a Contractor Default. Such notice shall indicate whether the Owner is requesting a conference among the Owner, Contractor and Surety to discuss the Contractor's performance. If the Owner does not request a conference, the Surety may, within five (5) business days after receipt of the Owner's notice, request such a conference. If the Surety timely requests a conference, the Owner shall attend. Unless the Owner agrees otherwise, any conference requested under this Section 3.1 shall be held within ten (10) business days of the Surety's receipt of the Owner's notice. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default;

.2    the Owner declares a Contractor Default, terminates the Construction Contract and notifies the Surety; and

.3    the Owner has agreed to pay the Balance of the Contract Price in accordance with the terms of the Construction Contract to the Surety or to a contractor selected to perform the Construction Contract.

**§ 4** Failure on the part of the Owner to comply with the notice requirement in Section 3.1 shall not constitute a failure to comply with a condition precedent to the Surety's obligations, or release the Surety from its obligations, except to the extent the Surety demonstrates actual prejudice.

**§ 5** When the Owner has satisfied the conditions of Section 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

**§ 5.1** Arrange for the Contractor, with the consent of the Owner, to perform and complete the Construction Contract;

**§ 5.2** Undertake to perform and complete the Construction Contract itself, through its agents or independent contractors;

**§ 5.3** Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and a contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Section 7 in excess of the Balance of the Contract Price incurred by the Owner as a result of the Contractor Default; or

**§ 5.4** Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

.1    After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, make payment to the Owner; or

.2    Deny liability in whole or in part and notify the Owner, citing the reasons for denial.

**§ 6** If the Surety does not proceed as provided in Section 5 with reasonable promptness, the Surety shall be deemed to be in default on this Bond seven days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner. If the Surety proceeds as provided in Section 5.4, and the Owner refuses the payment or the Surety has denied liability, in whole or in part, without further notice the Owner shall be entitled to enforce any remedy available to the Owner.

**§ 7** If the Surety elects to act under Section 5.1, 5.2 or 5.3, then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract, and the responsibilities of the Owner to the Surety shall not be greater than those of the Owner under the Construction Contract. Subject to the commitment by the Owner to pay the Balance of the Contract Price, the Surety is obligated, without duplication, for

  .1  the responsibilities of the Contractor for correction of defective work and completion of the Construction Contract;

  .2  additional legal, design professional and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Section 5; and

  .3  liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor.

**§ 8** If the Surety elects to act under Section 5.1, 5.3 or 5.4, the Surety's liability is limited to the amount of this Bond.

**§ 9** The Surety shall not be liable to the Owner or others for obligations of the Contractor that are unrelated to the Construction Contract, and the Balance of the Contract Price shall not be reduced or set off on account of any such unrelated obligations. No right of action shall accrue on this Bond to any person or entity other than the Owner or its heirs, executors, administrators, successors and assigns.

**§ 10** The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

**§ 11** Any proceeding, legal or equitable, under this Bond may be instituted in any court of competent jurisdiction in the location in which the work or part of the work is located and shall be instituted within two years after a declaration of Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

**§ 12** Notice to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the page on which their signature appears.

**§ 13** When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. When so furnished, the intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

**§ 14 Definitions**
**§ 14.1 Balance of the Contract Price.** The total amount payable by the Owner to the Contractor under the Construction Contract after all proper adjustments have been made, including allowance to the Contractor of any amounts received or to be received by the Owner in settlement of insurance or other claims for damages to which the Contractor is entitled, reduced by all valid and proper payments made to or on behalf of the Contractor under the Construction Contract.

**§ 14.2 Construction Contract.** The agreement between the Owner and Contractor identified on the cover page, including all Contract Documents and changes made to the agreement and the Contract Documents.

**§ 14.3 Contractor Default.** Failure of the Contractor, which has not been remedied or waived, to perform or otherwise to comply with a material term of the Construction Contract.

**§ 14.4 Owner Default.** Failure of the Owner, which has not been remedied or waived, to pay the Contractor as required under the Construction Contract or to perform and complete or comply with the other material terms of the Construction Contract.

**§ 14.5 Contract Documents.** All the documents that comprise the agreement between the Owner and Contractor.

**§ 15** If this Bond is issued for an agreement between a Contractor and subcontractor, the term Contractor in this Bond shall be deemed to be Subcontractor and the term Owner shall be deemed to be Contractor.

---

**§ 16** Modifications to this bond are as follows:

OBLIGATIONS TO BE MET UNDER THE PERFORMANCE BOND

1. SUBMITTAL OF COMPREHESIVE REPORT (REPORT) THAT ADDRESSES THE POTENTIAL IMPACTS OF THE FIELD TURF AND CRUMB RUBBER RELEASED INTO THE PUYALLUP RIVER. THE REPORT MAY REPRESENT AN EXPANSION OF THE AUGUST 13, 2020 SHANE CHERRY DRAFT MATERIAL REMOVAL PLAN OR, MAY BE WHOLLY SEPARATE DOCUMENT. THE REPORT MUST PRESENT A METHODOLOGY FOR THE FIELD REVIEWS TO OCCUR UNTIL SUCH TIME AS IT CAN REASONABLY BE CONCLUDED THAT NO MATERIAL REMAINS IN THE RIVER, OR THAT NO FURTHER REMOVAL IS PRACTICABLE.

   THE REPORT MAY BE SUBMITTED SEPARATELY, OR AS PART OF, THE COMPLETE APPLICATION PACKAGE NOTED AS ITEM 2.

2. SUBMITTAL OF A COMPLETE APPLICATION, PER PIERCE COUNTY CODE SECTION 18.40.020, TO PIERCE COUNTY FOR THE CONSTRUCTION OF A FISH EXCLUSION FACILITY AND THE OTHER ELEMENTS OUTLINED IN PIERCE COUNTY'S NOVEMBER 24 AND DECEMBER 16, 2020 LETTERS

3. INSTALLATION OF A FISH SCREEN, APPROVED AS NECESSARY BY AGENCIES WITH AUTHORITY, AT THE FLUME INTAKE

   ONCE ITEMS 1, 2, AND 3 ARE REVIEWED AND APPROVED, THE BOND WILL BE RELEASED

*(Space is provided below for additional signatures of added parties, other than those appearing on the cover page.)*

| **CONTRACTOR AS PRINCIPAL** | | **SURETY** | |
|---|---|---|---|
| Company: | *(Corporate Seal)* | Company: | *(Corporate Seal)* |
| ELECTRON HYDRO, LLC | | LIBERTY MUTUAL INSURANCE COMPANY | |
| Signature: Thom A Fischer | | Signature: | |
| Name and Title: THOM A. FISCHER , COO MANAGER | | Name and Title: Attorney-in-Fact BLAINE HUTTON, SENIOR UNDERWRITING SPECIALIST | |
| Address: 1800 JAMES STREET SUITE 201 BELLINGHAM, WA 98225 | | Address: | |

AIA Document A312™ – 2010. The American Institute of Architects.

4

**THIS POWER OF ATTORNEY IS NOT VALID UNLESS IT IS PRINTED ON RED BACKGROUND.** 100023363

**This Power of Attorney limits the acts of those named herein, and they have no authority to bind the company except in the manner and to the extent herein stated.**

**LIBERTY MUTUAL INSURANCE COMPANY**
**BOSTON, MASSACHUSETTS**

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS:

That Liberty Mutual Insurance Company (the "Company"), a Massachusetts stock insurance company, pursuant to and by authority of the By-law and Authorization hereinafter set forth, does hereby name, constitute and appoint.....**BLAINE HUTTON,..... ALL OF THE CITY OF EDMONTON,..... PROVINCE OF ALBERTA,.....** each individually if there be more than one named, its true and lawful attorney-in-fact to make, execute, seal, acknowledge and deliver, for and on its behalf as surety and as its act and deed, any and all undertakings, bonds, recognizances and other surety obligations, and the execution of such undertakings, bonds, recognizances and other surety obligations, in pursuance of these presents, shall be as binding upon and Company as if they had been duly signed by the president and attested by the secretary of the company in their own proper persons.

That this power is made and executed pursuant to and by authority of the following By-law and Authorization:

> ARTICLE XIII – Execution of Contracts: Section 5. Surety Bonds and Undertakings.
> Any officer of the Company authorized for that purpose in writing by the chairman or the president, and subject to such limitations as the chairman or the president may prescribe, shall appoint such attorneys-in-fact, as may be necessary to act in behalf of the Company to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations. Such attorneys-in-fact, subject to the limitations set forth in their respective powers of attorney, shall have full power to bind the Company by their signature and execution of any such instruments and to attach thereto the seal of the Company. When so executed such instruments shall be as binding as if signed by the president and attested by the secretary.

By the following instrument the chairman or the president has authorized the officer or other official named therein to appoint attorneys-in-fact:

> Pursuant to Article XIII, Section 5 of the By-laws, Steven Hastings, Assistant Secretary of Liberty Mutual Insurance Company, is hereby authorized to appoint such attorneys-in-fact as may be necessary to act in behalf of the Company to make, execute, seal, acknowledge and deliver as surety any and all undertakings, bonds, recognizances and other surety obligations.

That the By-law and the Authorization set forth above are true copies thereof and are now in full force and effect.

IN WITNESS WHEREOF, this Power of Attorney has been subscribed by an authorized officer or official of the company and the corporate seal of Liberty Mutual Insurance Company has been affixed thereto in Toronto, Ontario this 8 day of February, 2018.

**LIBERTY MUTUAL INSURANCE COMPANY**

BY ______________________
Steven Hastings, Assistant Secretary

PROVINCE OF ONTARIO
CITY OF TORONTO

On this 8 day of **February**, 2018, before me, a Notary Public, personally appeared Steven Hastings, to me known, and acknowledged that he is a Assistant Secretary of Liberty Mutual Insurance Company; that he knows the seal of said corporation; and that he executed the above Power of Attorney and affixed the corporate seal of Liberty Mutual Insurance Company thereto with the authority and at the direction of said corporation.

IN TESTIMONY WHEREOF, I have hereto subscribed my name and affixed my notarial seal at Toronto, Ontario, on the day and year first above written.

JESSICA CAROL ... ONTARIO NOTARY PUBLIC

Jessica Seppi
Notary Public in and for the Province of Ontario

**CERTIFICATE**

I, the undersigned, Assistant Secretary of Liberty Mutual Insurance Company in Canada, do hereby certify that the original power of attorney of which the foregoing is a full, true and correct copy, is in full force and effect on the date of this certificate; and I do further certify that the officer or official who executed the said power of attorney is a Assistant Secretary specially authorized by the chairman or the president to appoint attorneys-in-fact as provided in Article XIII, Section 5 of By-laws of Liberty Mutual Insurance Company.

This certificate and the above power of attorney may be signed by facsimile or mechanically reproduced signatures under and by authority of the following vote of the board of directors of Liberty Mutual Insurance Company at a meeting duly called and held on the 12th day of March, 1980.

> VOTED that the facsimile or mechanically reproduced signature of any assistant secretary of the company, wherever appearing upon a certified copy of any power of attorney issued by the company in connection with surety bonds, shall be valid and binding upon the company with the same force and effect as though manually affixed.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed the corporate seal of the said company, this 5 day of February, 2021.

Michael Weiss, Assistant Secretary

Not valid for mortgage, note, loan, letter of credit, bank deposit, currency rate, interest rate or residual value guarantees.

To confirm the validity of this Power of Attorney call 1-416-365-7587 between 9:00 am and 4:30pm EST on any business day.

BOND RIDER NUMBER 1

TO BE ATTACHED TO AND FORM PART OF

LIBERTY MUTUAL INSURANCE COMPANY

BOND NO. BDTO-600103-021


CONTRACTOR:           **ELECTRON HYDRO, LLC**

OWNER:                 **PIERCE COUNTY**

TYPE OF BOND:        **PERFORMANCE BOND**

BOND DATE:            **FEBRUARY 5TH, 2021**

CONTRACT DATE:     **FEBRUARY 5TH, 2021**

KNOW ALL PEOPLE BY THESE PRESENTS THAT the above reference Performance Bond has hereby been amended to read as follows and not as previously written:

1. Construction Contract:  **Settlement Agreement and Consent Decree**

2. Description:  **Remove temporary rock fill in the completion of a Spillway Replacement Project or Alternate Stabilization Project, and supply & install fish screen at Electron Hydro Electric Project located near the town of Kapowsin, Washington**

3. Section 16 Modifications – add the following under Point 2:

   a. **The Contractor's performance obligation includes the removal of the Temporary Rock Spillway described in Pierce County's December 16, 2020 letter, in the performance of a Spillway Replacement Project or Alternative Stabilization Plan as described in Appendix E to the Consent Decree in *United States v. Electron Hydro LLC et al*., 2:20-cv-1746 (W.D. Wash.)**
   b. **The Contractor's performance obligation includes securing all necessary permits and approvals from Pierce County and the U.S. Army Corps of Engineers, and any others that may apply, including the payment of application fees and provision of funds for any mitigation that may be required under the Clean Water Act section 404(b)(1) Guidelines.**

4. Section 16 Modifications – add the following:
   **This Bond includes a Dual Owner Rider**

All other terms and conditions remain unchanged.

IN WITNESS WHEREOF, the Contractor and the Surety have signed and sealed this Bond Rider this [___] day of [_____], 2023.

**ELECTRON HYDRO, LLC**


_____
                                                              CONTRACTOR

**LIBERTY MUTUAL INSURANCE COMPANY**


_____
**[ROBERT LEDDY], Attorney-In-Fact**        SURETY

# DUAL OWNER RIDER
# (BOND RIDER NUMBER 2)
# TO CONTRACT PERFORMANCE BOND

WHEREAS, on or about the 5th day of February, 2021, **Electron Hydro, Inc.**, as Contractor, hereinafter called the Contractor, entered into a written Settlement Agreement with **Pierce County**, as Owner, hereinafter called the Owner, for the **Remove temporary rock fill in the completion of a Spillway Replacement Project or Alternate Stabilization Project, and supply & install fish screen at Electron Hydro Electric Project located near the town of Kapowsin, Washington**, herein referred to as the Contract; and

WHEREAS, the Contractor and the Liberty Mutual Insurance Company, as Surety, hereinafter called Surety, made, executed and delivered to said Owner their joint and several Performance Bond # **BDTO-600103-021**, hereinafter called Bond.

WHEREAS, the Owner has requested the Contractor and Surety to join with the Owner in the execution and delivery of this Dual Owner Rider, and the Contractor and Surety have agreed to do so upon the conditions herein stated.

NOW, THEREFORE, in consideration of One Dollar and other good and valuable considerations, receipt of which is hereby acknowledged, the undersigned hereby agree as follows:

The Bond aforesaid shall be and it is hereby amended as follows:

1. The names of the **United States Environmental Protection Agency** shall be added to said Bond as Named Owner, hereinafter called the Owner, also known as Additional Owner.

2. There shall be no liability on the part of the Contractor or Surety under this bond to the Owners, or any of them, unless the Owners, or any of them, shall make payments to the Contractor, or to the Surety in case it arranges for completion of the Contract upon default of the Contractor, strictly in accordance with the terms of said Contract as to payments, and shall perform all the other obligations required to be performed under said Contract at the time and in the manner therein set forth.

3. It is further understood and agreed, that except as herein modified, the said Bond shall be and remain in full force and effect; and nothing herein contained shall be held to change, alter or vary the term of the above-described bond, including the aggregate liability of the Surety.

SIGNED, sealed and dated in counterparts this _____ day of _____ , _____.

Signatures on next page

SIGNED, sealed and dated in counterparts this _____ day of _____ , _____.

ACCEPT OR ATTEST:
  CONTRACTOR:                           **ELECTRON HYDRO, LLC**

_____
Contractor Signature

_____
Print Name and Title of Contractor
I have the authority to bind the LLC

  SURETY:                           **LIBERTY MUTUAL INSURANCE COMPANY**

_____
[ROBERT LEDDY], Attorney-In-Fact

  OWNER:                           **PIERCE COUNTY**

_____
Owner Signature

_____
Print Name and Title of Owner
I have the authority to bind the County

ADDITIONAL OWNER:         **UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

_____
Additional Owner Signature

_____
Print Name and Title of Additional Owner
I have the authority to bind the United States Agency

Appendix F

**Appendix F: Independent Contractor Certification**


[CONTRACTOR] makes the following certifications and representations.


"Independent Contractor" means [CONTRACTOR], and the employees or subcontractors hired to conduct the work described in Appendices A and B of the Consent Decree in *United States et al. v. Electron Hydro et al.* 2:20-cv-01746-JCC (W.D. Wash.).

"Defendants" means Electron Hydro and Mr. Thom A. Fischer.

"EPA" means the United States Environmental Protection Agency.


1. Financial interests.
   a. [CONTRACTOR] has no financial interest in the Defendants or any of their subsidiaries or affiliates.
   b. If, between the date of this certification and when [CONTRACTOR]'s term as the Independent Contractor expires, [CONTRACTOR]'s financial interests with respect to the Defendants change, [CONTRACTOR] agrees to notify the EPA in writing as soon as reasonably possible after becoming aware of the change.

2. Employment, professional relationships, and affiliations.
   a. [CONTRACTOR] is not a party to any employment, consulting, agency, attorney-client, auditing or other professional relationship or affiliation with the Defendants, or any of their subsidiaries or affiliates.
   b. [CONTRACTOR] has not been a party to such a professional relationship or affiliation with the Defendants within the past three years.
   c. [CONTRACTOR] agrees not to engage in such a professional relationship or affiliation with the Defendants during its work as an Independent Contractor and for a period of at least one year after completing work.


Date: _____          Name: _____

On behalf of CONTRACTOR